Stuart **TURNER** and Richard A. Bernstein, Plaintiffs,

v.

Joel E. **BERNSTEIN**, M.D., James L. Currie, Frank A. Ehmann, Neal S. Penneys, M.D., Jeremy Silverman and Laura Pearl, Defendants.

Civ.A. No. 16190.

Court of Chancery of Delaware, New Castle County.

Submitted: May 15, 2000.

Decided: June 6, 2000.

Ronald A. Brown, Jr., and James L. Holzman, of Prickett, Jones & Elliott, Wilmington, for Plaintiff.

Gregory V. Varallo, and Russell C. Silberglied, of Richards, Layton & Finger, Wilmington; Michael S. Poulos, and Lucinda J. Bach, of Piper Marbury Rudnick & Wolfe, Chicago, Illinois, of counsel, for Defendants.

## OPINION

STRINE, Vice Chancellor.

This opinion addresses a motion for partial summary judgment by plaintiffs Stuart Turner and Richard A. Bernstein (collectively, the "plaintiffs") against the former directors of GenDerm Corporation. The plaintiffs allege that the GenDerm directors breached their fiduciary duties by failing to provide the GenDerm stockholders with information material to the decision whether to approve a merger of GenDerm into a wholly-owned subsidiary of Medicis Pharmaceutical Corporation in December 1997. In particular, the plaintiffs allege that the GenDerm directors deprived the company's stockholders of the information necessary to make an informed decision whether to accept the consideration offered in the Medicis merger or to seek appraisal.

It is undisputed that the GenDerm board provided the GenDerm stockholders with extremely cursory information in connection with the Medicis merger. For example, the GenDerm board did not give the stockholders any current financial information or explain why the merger was in the best interests of the GenDerm stockholders. While the board did tell stockholders they could call the company if they had any questions, the board essentially defaulted on its affirmative obligation to disclose the information material to the decisions it was asking the GenDerm stockholders to make.

Because the inadequacy of the company's disclosures is indisputably clear and because GenDerm's certificate of incorporation contained no exculpatory provision immunizing breaches of the duty of care, the plaintiffs are entitled to partial summary judgment as to the liability aspect of their disclosure claims. In so ruling, I reject the directors' claim that the plaintiffs waived their claim because they accepted the merger consideration when they had reason to suspect that the merger consideration was inadequate and because they signed a letter of transmittal waiving their right to seek a statutory appraisal under 8 *Del. C.* § 262. I do so because: (1) stockholders are entitled to receive the information material to their decision from the company's directors and are not required to make the decision whether to accept the immediate benefits of the merger consideration or to explore the more uncertain appraisal trail merely because, lacking such material information, they suspect that the transaction may be unfair; (2) there is no record evidence, in any event, that the plaintiffs actually had access to adequate information to make an informed judgment; and (3) the waiver in the letter of transmittal extended by its plain terms only to appraisal actions and not to equitable actions for breach of fiduciary duty.

## I. *Factual Background* [1]

### A. *What Was GenDerm?*

Before the Medicis merger, GenDerm was a non-public corporation that sold topically applied pharmaceutical products, such as an arthritis pain relieving cream. Dr. Joel E. Bernstein ("Dr. Bernstein") founded GenDerm and served as its Chairman of the Board during the entire thirteen-year period preceding the merger. Dr. Bernstein is not related to plaintiff Richard Bernstein.

Although not a public corporation, GenDerm was owned by a fairly broad group of stockholders. It had over eleven and half million issued shares held by in excess of 150 record holders. But voting control of the company was not dispersed. Rather, the GenDerm board of directors controlled a majority of the company's stock.

### B. *GenDerm Looks For A Merger Partner And Eventually Finds Medicis*

In late 1995 and 1996, GenDerm apparently experienced some financial difficulties, which gave rise to its consideration of a strategic transaction that would involve the sale of the company.

When the search for a buyer began, Frank DiPrima was GenDerm's Chief Executive Officer ("CEO") and President. In January 1996, DiPrima had successfully encouraged plaintiffs Turner and Richard Bernstein, as well as Michael Pietrangelo – with each of whom DiPrima had a preexisting friendship – to become GenDerm stockholders in order to raise capital for

---

**1.** Given the procedural posture of this case, I set forth the defendants' version of the facts where there is evidence to support that version.

the company. A few months later, Gen-Derm hired Lehman Brothers to find a buyer. According to the defendants, Lehman was only able to find a few pharmaceutical companies interested enough even to begin due diligence.

In September 1996 – while GenDerm was in the midst of negotiations with the only remaining strategic buyer located by Lehman – DiPrima resigned his offices but stayed on as a consultant. Shortly thereafter, the buyer went away. Not long after DiPrima's resignation, defendants claim, very disturbing facts about GenDerm's performance and financial condition came to light, making it more difficult to find a buyer and suggesting that the company's viability as a going concern was in doubt.

In April 1997, Dr. Bernstein terminated DiPrima's consulting contract with Gen-Derm and accused DiPrima of misconduct during his tenure as an officer. This eventually sparked litigation by DiPrima against the company.

After DiPrima's resignation, Dr. Bernstein had stepped in as interim CEO and pressed on with the search for a buyer. In June 1997, GenDerm agreed to sell GenDerm's Euroderma subsidiary to Bioglan Pharma PLC for $2.2 million.[2] By mid–1997, GenDerm's board had empowered Dr. Bernstein and another GenDerm director as a two-person special committee to "represent the Company in all current and future equity transaction negotiations."[3] The creation of the special committee apparently resulted from an expression of interest from Bioglan in buying the rest of GenDerm.

On August 1, 1997, Bioglan sent Gen-Derm a proposal contemplating a purchase of GenDerm for $60 million plus possible contingent payments of up to $20 million. When Bioglan could not obtain financing, this strategic option went away.

But the same broker who had represented Bioglan in dealing with GenDerm soon told Dr. Bernstein that he had another client willing to buy the company on essentially the same terms as Bioglan had proposed. That client was Medicis.

GenDerm followed up with Medicis, and negotiations ensued. On October 3, 1997, Dr. Bernstein provided Medicis with a package of materials discussing Gen-Derm's financial conditions and prospects (the "Seller's Report"). The Seller's Report was "reviewed and approved" by Dr. Bernstein before it was transmitted to Medicis.[4]

Two weeks later, GenDerm entered into a letter of intent contemplating an acquisition of the company by Medicis on terms similar to those proposed by Bioglan. As GenDerm explained to its shareholders, the merger consideration consisted on a per share basis of:

1. Approximately $3.64 in cash at closing.
2. Contingent cash payments totaling up to approximately $0.89 upon the release of escrow funds, expected to occur over the 32 months after closing (the exact amount and timing of the payments will depend on the amount of claims, if any, against the escrow

---

2. The plaintiffs challenged the Euroderma transaction in this lawsuit, but that count was dismissed because Vice Chancellor Jacobs held that the claim was derivative and that the plaintiffs had lost standing in the merger. *Turner v. Bernstein I*, mem. op. at 27–33, 1999 WL 66532.

3. PX 14 (July 16, 1997 Board Minutes at 2).

4. Dr. Bernstein Dep. at 136.

and the costs, if any, of arbitrating these claims).

3. Contingent cash "earnout" payments of up to approximately $1.44 expected to be paid in the year 2000, based on GenDerm's 1999 sales.

The consideration per Series C preferred share (convertible into 5 common shares) will be 5 times the foregoing.[5]

### C. The GenDerm Board Secures The Votes Necessary To Approve The Merger Through A Selective Outreach To GenDerm Stockholders

At the time GenDerm executed the letter of intent with Medicis, the GenDerm bylaws stated that non-unanimous stockholder action by written consent could not be taken until after five days' prior notice was provided to all GenDerm stockholders. By a directors' consent executed in mid-November 1997, the GenDerm board amended the bylaws to carve the Medicis merger out from this requirement.[6] The amendment was also agreed to by the directors in their capacities as stockholders or stockholder-representatives and was thus assented to by over half of the outstanding GenDerm shares. According to the defendants, Medicis's desire for a rapid closing impelled the GenDerm Board's decision to close the merger before all the stockholders could vote and receive notice of their appraisal rights.

On or about December 1, 1997, the GenDerm board sought written consents approving the Medicis merger. On its face, the solicitation appears to have been addressed to all GenDerm stockholders. But the solicitation was apparently not sent to all the stockholders. Plaintiffs claim that they never received it, and the defendants have produced no evidence that it was sent to them.

Furthermore, to the extent that the solicitation was genuinely one of all stockholders, the timing of its mailing was breathtakingly risky. The package was dated December 1, 1997 but indicates that "[t]he closing of the transaction is expected to occur on or about *next Wednesday* December 3, 1997."[7]

The solicitation materials consisted solely of a one-page letter, a consent form, and a copy of the merger agreement and of 8 *Del. C.* § 262. Aside from a paragraph describing the merger consideration (previously quoted above), the only substantive portions of the solicitation letter stated:

> **The Board of Directors has approved the transaction and recommends that the Company's stockholders approve the transaction . . . .**
>
> Over the last several months, the Board has explored options for selling the Company. The undersigned [Dr. Bernstein and director Silverman] were designated as a Committee of the Board to hold discussions with interested parties. We enthusiastically endorse the proposed transaction.[8]

As promised, the Medicis merger closed, and a certificate of merger was filed on December 3, 1997.

After consummation, GenDerm sent two communications to its stockholders for the purposes of informing them of their appraisal rights and of facilitating their acceptance of the merger consideration. The appraisal-specific communication informed the GenDerm stockholders that they had twenty days to demand appraisal

---

5. PX 18.

6. *Id.*

7. PX 18 (emphasis in original).

8. *Id.* (emphasis in original).

and informed them that if they had "any questions," they could call GenDerm's corporate secretary at a specified phone number.[9] The communication informing stockholders how to exchange their shares for the merger consideration said that the stockholders could seek an answer to their questions from one of the company's lawyers at Kirlkand & Ellis, Donald Batterson.

Neither of the communications contained additional information bearing on the advisability of the merger or the fair value of GenDerm's stock.

### D. *Much More Information Was Provided To Medicis Than Was Provided To GenDerm's Stockholders*

As is typically the case in negotiated transactions, GenDerm gave a good deal of financial information to Medicis in advance of Medicis's decision to sign a binding merger agreement. It is also typical for the information provided to a merger partner to exceed in detail and scope that provided to the stockholders in connection with the vote on the merger.

What is anomalous about this case is the total dearth of information provided to the GenDerm stockholders. They did not even receive the company's most recent financial results for the periods proximate to the vote. They did not receive any projections of future company performance or any explanation of why the GenDerm board believed that the merger consideration was more worthwhile to the stockholders than the returns that could be expected if the company were to pursue its existing business plan.

As the plaintiffs point out, the Seller's Report provided to Medicis by GenDerm in October 1997 contained a great deal of information that GenDerm stockholders would have found material in determining whether to accept the merger consideration or seek appraisal. Some excerpts from the Seller's Report follow:

> GenDerm Corporation (the Company) is a very different and a much healthier company than it was one year ago.

> \* \* \*

> Gross sales for the U.S. in 1997 are now expected to be in excess of the $26.1 million upon which the attached pro forma 1997 Income statement was based.... As can be seen from the 1997 September YTD Preliminary (based on *actual* September gross sales and high confidence expense estimates) Income Statement, the Company has been profitable since May 1997.

> \* \* \*

> With growth driven by new products – particularly OVIDE® Cream Shampoo and ZONACORT- Cream, GenDerm gross sales are expected to reach $100 million by the year 2002.

> \* \* \*

> A number of profitable new product introductions are planned during the 1998–2002 time frame.

> \* \* \*

> On June 9[, 1997] the Company received a Notice of Intent to Issue Reexamination Certificate from the U.S. Patent and Trademark Office. The enforcement of the reissued patent will enable GenDerm to successfully remove store brands and competitive brand capsaicin creams from store shelves and recoup $15–20 million (at ZOSTRIX prices) in sales lost to these knock-offs.

> \* \* \*

> The Company's product lines continue to generate extraordinary gross profits and, under the modified business model

9. PX 21.

we currently embrace, will generate very high product contribution margins for the balance of 1997 and beyond.

* * *

The Company ... has no long term debt.... Under the new business model, the Company is highly profitable on both the gross profit and product profit contribution levels.[10]

The Seller's Report also included audited financial statements for the years 1994, 1995, and 1996, unaudited results for 1997 through August 31, 1997, "high confidence" estimates for 1997 results through September 30, 1997, and projected results for the company for the period 1998–2002. None of this information was provided to the GenDerm stockholders at the time the GenDerm board asked them to approve the merger and to decide whether to accept the merger consideration or seek appraisal.

Nor was this lack of disclosure counterbalanced by any prior disclosures of comparable information. As will soon be discussed, GenDerm took full advantage of its status as a non-public company not subject to federal disclosure obligations and had a general policy of not reporting its financial results.

### E. The Court's Prior Decision Regarding The Board's Disclosures

The paucity of disclosures in connection with the Medicis merger inspired the plaintiffs to file an earlier motion for summary judgment as to their disclosure claims. Unsurprisingly, the defendants did not defend that motion based on the adequacy of the disclosures the company

actually made to the plaintiffs in connection with the Medicis merger. Rather, the defendants argued, among other things,[11] that the plaintiffs had obtained information from other sources at the company sufficient to make an informed investment decision and that their knowing decision to accept the merger consideration therefore constitutes a waiver of their right to challenge the merger.

On the record then before him, Vice Chancellor Jacobs declined to grant summary judgment, stating:

Our case law recognizes that a stockholder who surrenders his shares in a merger and accepts the merger consideration and the other benefits of the merger, will be deemed to have waived his right to seek appraisal or otherwise to challenge the transaction, provided that the decision to accept the merger was fully informed. The question presented here is whether the undisputed facts are sufficient to establish as a matter of law that the plaintiffs were not fully informed when they elected to accept the merger consideration.

Summary judgment is appropriate where the moving party can demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. On a motion for summary judgment the Court must treat all facts in the light most favorable to the non-moving party (here, the former GenDerm directors) and it must deny summary judgment where there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as

---

10. PX 10 at ME/SR0333–336, 339.

11. The GenDerm defendant directors also contended that upon consummation of the Medicis merger, the duty to provide information material to the decision whether to ac-

cept the merger consideration or seek appraisal shifted to Medicis. Vice Chancellor Jacobs rejected this argument. *Turner v. Bernstein I*, mem. op. at 16–20.

to a material fact or inferences to be drawn therefrom. Summary judgment may also be denied if the court, upon reviewing the record, determines that it is more desirable to inquire into or develop more thoroughly the facts in order to clarify application of the law to the circumstances.

The former directors argue that the record on this issue involves disputed fact questions. *They contend that the plaintiffs received GenDerm's most recent financial statements shortly before the merger. They also point out that plaintiff [Richard] Bernstein and GenDerm's former president and CEO, Mr. DiPrima, had a long-standing relationship that was a potential channel for plaintiffs to have private access to information about GenDerm's pre-merger financial status. The defendants underscore that both plaintiffs signed consent forms that expressly and pointedly told them that signing the consents would operate as a waiver of appraisal rights, and that the plaintiffs then accepted the merger consideration. Lastly, the defendants point out that although the Letter of Transmittal invited the recipients to call a telephone number if they needed more information, the plaintiffs did not do so.* These facts, the defendants argue, create sufficient reason to doubt the plaintiffs' professions of ignorance of GenDerm's premerger financial condition, and preclude the entry of judgment as a matter of law.

I agree that a grant of summary judgment would be imprudent. Further discovery is needed to flesh out what specific facts the plaintiffs knew or had available to them when they decided to accept the merger consideration. Because the present record on that issue is not adequate, the plaintiffs' motion for partial summary judgment on Count One will be denied.[12]

Since Vice Chancellor Jacobs's prior decision, the defendants have had the opportunity to fill out the record bearing on their waiver defense. I turn to an examination of that evidence now.

F. *What Information Did Plaintiffs Turner and Richard Bernstein Have Access To In Making Their Decision Whether To Seek Appraisal?*

The defendant directors' defense on this motion is that plaintiffs Turner and Richard Bernstein personally possessed the information material to the decision whether to accept the merger consideration rather than to seek appraisal and that by accepting the Medicis merger consideration they thereby waived their right to seek damages for any breach of fiduciary duty by the GenDerm directors in connection with the Medicis merger.

The defendant directors' claim that the plaintiffs possessed sufficient information is predicated on the plaintiffs' receipt of certain information from GenDerm in mid–1997, their receipt of press releases issued by Medicis in connection with the Merger, and their relationship with Frank DiPrima, GenDerm's former CEO. I now deal with each source of information.

1. *Richard Bernstein Receives GenDerm's Results For 1995 And 1996 After Threatening Litigation*

As noted, GenDerm was a non-public company and did not provide its stockholders with annual reports or financial statements. During mid–1997, plaintiff Rich-

---

**12.** *Turner v. Bernstein I*, mem. op. at 21–24 (quotations and citations omitted) (emphasis added).

ard Bernstein apparently became worried about his investment in GenDerm and the dearth of information accessible to him as a stockholder. He contacted the company and tried to speak with defendant Dr. Bernstein. What ensued next is best described by simply setting forth the ensuing exchange of letters between the two Bernsteins, starting with Richard Bernstein's letter of July 2, 1997:

> I acknowledge that we have played "telephone tag" for several months after you finally returned the many calls initiated by me. The purpose of my calls should have been obvious to you and undoubtedly Ron Sandler advised you of my call to him.
>
> As a significant shareholder of GenDerm since January 1996, I am appalled at the total lack of communication from the company. I have received, to date, nothing more than a proxy which I returned to the company on March 10, 1997 and in which I voted against each of the nominees for director. I have never received from the company an annual report, financial statement, status report or any other form of communication.
>
> I would appreciate a very prompt response to this letter. Such response must include copies of all financial statements (annual and interim) since fiscal year 1995, copies of all Board meeting minutes, a business status report and all other information that would allow a reasonable man to assess the value of his investment, the competency of the company's management and the responsiveness of the Board to its fiduciary duties to shareholders.
>
> I am not a litigious individual unless I believe I am being taken advantage of. Thus far, my investment in GenDerm

has been an unrewarding pursuit and one in which I feel I have been taken advantage of. Please let's avoid actions that will prove to be costly and unproductive. Please provide me with a prompt response that provides reasonable information on the activities and status of the company.[13]

Dr. Bernstein then replied with a letter dated July 8, 1997, which stated:

> I am in receipt of you July 2, 1997 letter and appreciate your interest in GenDerm. Incidentally, I returned each of your calls to me over the last few months, including a follow-up to your call to Ron Sandler, and would be delighted to talk with you, if you so wish. I trust that you received my messages.
>
> As you know, GenDerm is not a public company. Accordingly, substantially all information regarding GenDerm (including its financial results) is confidential. In an effort to maintain that confidentiality, GenDerm does not distribute annual reports or other information to its stockholders. Instead, information is discussed at annual stockholder meetings and GenDerm honors the right of any stockholder to inspect its books and records at its headquarters upon compliance with the statutory requirements. Notwithstanding our normal procedure, under separate cover I am sending you the audited financial statements for 1995 and 1996. I ask that you keep them confidential. Please call me if you have further questions or would like to discuss GenDerm and our current business plans further.[14]

After that exchange and Richard Bernstein's receipt of the 1995 and 1996 results, Richard Bernstein did not seek further information until he learned about the

---

13. PX 23.

14. PX 22.

merger in December 1997. According to Richard Bernstein, he did not push harder for information because it had become clear to him that the company would not provide him with the rest of the information he sought and that further discussions with Dr. Bernstein were futile. Whatever the story, the plaintiffs and the defendants agree that Richard Bernstein received the 1995 and 1996 company financials[15] but that GenDerm otherwise provided him with no other information at that time.

In December 1997, Richard Bernstein says he placed a phone call to Dr. Bernstein but did not receive a return call.

### 2. The Plaintiffs Receive Copies Of Medicis Press Releases Issued In Connection With The Merger

On December 1 and December 5, 1997, plaintiff Richard Bernstein received from Michael Pietrangelo a copy of *Medicis* – not GenDerm – press releases regarding the merger. Pietrangelo was a Medicis director who had become a GenDerm stockholder at the same time as the plaintiffs. Richard Bernstein shared the press releases with Turner. While those releases contained useful information, they surely did not contain all, or even most, of the material facts bearing on the decisions facing GenDerm stockholders.

There is no record evidence indicating that Pietrangelo provided any other information to the plaintiffs regarding Gen-Derm or the Merger. Moreover, it bears emphasis that the releases were drafted by *Medicis*, not by GenDerm, the company whose board owed fiduciary duties to the plaintiffs and in whose fidelity the plaintiffs were entitled to repose trust.

### H. What Did Frank DiPrima Know And When Did He Know It?

The defendants allege that both Richard Bernstein and Turner were informed of the necessary material information about GenDerm by Frank DiPrima. This defense has created some awkwardness because Richard Bernstein and Turner retained DiPrima as their lawyer in connection with the Medicis merger in early December 1997. By that time, over a year had passed since DiPrima had been an officer and director of GenDerm, DiPrima had already filed suit against GenDerm, and six months had elapsed since Dr. Bernstein first accused him of misconduct. The plaintiffs clearly sought to retain DiPrima with a view toward challenging the merger's fairness as well as other transactions such as the Euroderma sale.

Upon the request of the defendants and in the spirit of Vice Chancellor Jacobs's prior ruling, I granted the defendants the opportunity to depose DiPrima regarding his knowledge of GenDerm's condition as of December 1997.[16] Moreover, the defen-

---

**15.** At the same time he was given 1995 and 1996 financial statements, Richard Bernstein also received unaudited operating results for the first quarter of 1997 with some descriptive information.

**16.** I did not grant the defendants' request to ask about communications between DiPrima and the plaintiffs after DiPrima was retained as counsel by the plaintiffs. I reasoned as follows.

First, there was no reason to pierce the privilege unless the defendants could show that DiPrima had access to the material facts and thus could have communicated them to the plaintiffs. Thus I gave defendants the opportunity to question DiPrima fully regarding what he knew. Tellingly, the defendants spent little time on this task (e.g., they never asked him whether he had obtained the Seller's Report in December 1997, the key evidence upon which the plaintiffs rely) and spent most of the time trying to find what DiPrima and his clients discussed, who else DiPrima talked to about the merger, and about other aspects of DiPrima's factual investigation on behalf of his clients. Although the deposition practice in this case was hardly

dants also had access to a previous deposition of DiPrima that bore on these issues, as well as document discovery from him.

This discovery did not bear fruit. Pursuant to his own information request to GenDerm in August 1997, DiPrima received the same 1995–1996 information that Richard Bernstein had gotten and was refused the additional information he sought. In July 1997, DiPrima had also learned of the sale of Euroderma to Bioglan, a sale he came to believe was unfair to GenDerm.

DiPrima first got wind of the possibility of the Medicis merger in November 1997 from Pietrangelo, one of the stockholders DiPrima had brought into GenDerm in 1996, who also happened to serve as a Medicis director. On December 1, 1997, DiPrima again spoke with Pietrangelo, as well as Patricia Lamb, a GenDerm employee, and plaintiff Richard Bernstein. At that time, DiPrima learned that a merger with Medicis was imminent. Thereafter, DiPrima was retained by the plaintiffs, sought information about the merger on the Internet, and secured a copy of the merger agreement.

But DiPrima denies having any additional information about GenDerm's condition. He says that he learned little from Pietrangelo because Pietrangelo's duties as a Medicis director caused both of them to be circumspect about discussing the merger. DiPrima also contends that, like the plaintiffs, he was frustrated by GenDerm's closed-lips approach. There is nothing in the record to contradict DiPrima's testimony. The defendants have presented no evidence that particular GenDerm insiders funneled specified information to DiPrima.[17] Indeed, DiPrima testified that after

a model on either the plaintiffs' or the defendants' side, a reading of DiPrima's deposition shows that the defendants were able to fully explore what DiPrima knew. Having permitted the defendants to do and the defendants having failed to demonstrate any reasonable basis to believe that DiPrima himself knew all the material facts, there is no basis to allow inquiry into what he told the plaintiffs.

Second, the defendants have not persuaded me that I should take the novel step of vitiating the attorney-client privilege on the ground that a stockholder plaintiff engaged counsel, therefore must have been considering suit, and thus has put his knowledge of the material facts at issue. The defendants are the ones who have put the plaintiffs' knowledge at issue by raising an affirmative defense. *Fitzgerald v. Cantor*, Del. Ch., C.A. No. 16190, let. op. at 4 n.4, 1999 WL 64480 at *2, Steele, V.C. (Jan. 28, 1999) ("A party does not waive the attorney-client privilege under the 'at-issue' exception, however, merely by bringing a suit in which the communications are relevant."); *Hoechst Celanese Corp. v. National Union*, Del. Super., 623 A.2d 1118, 1125 (1992) (same).

Third, in the ordinary transaction, corporate defendants realize that the way to prevail on an affirmative defense under *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 848 (1987), is to present evidence that the board or the company's officers provided the plaintiffs with all the material facts. The fact that the defendants cannot take that course here is no reason for this court to disregard the attorney-client privilege and thereby set a troubling precedent that could arguably apply in a substantial number of cases brought by stockholder plaintiffs. If corporate directors wish to present *Bershad* defenses, they should be careful to attend to their disclosure obligations.

For similar reasons, I also deny the defendants' request to inquire into the discussions between DiPrima and the plaintiffs regarding the effect of executing the letter of transmittal on their ability to prosecute an equitable fiduciary duty action. As indicated later, it is reasonable to assume that the plaintiffs proceeded as they did for tactical reasons, and I confront that possibility directly. Having done so, and having thus assumed the defendants' best case scenario, I need not further address the defendants' request to have the plaintiffs and their counsel describe their litigation strategy discussions.

17. At oral argument, the defendants belatedly sought to depose Pietrangelo. I denied this request because the defendants had known

the merger was announced he called the attorney designated in the appraisal notice, Mr. Batterson, to get information and was told that Batterson was on vacation. This testimony is unrebutted.

I. *The Terms Of The Letters Of Transmittal Turner and Richard Bernstein Executed In Order To Receive The Merger Consideration*

Finally, the defendants argue that both plaintiffs waived their right to challenge any aspect of the defendant directors' conduct in relation to the Medicis merger by executing letters of transmittal. Those letters state in pertinent part:

THE UNDERSIGNED UNDERSTANDS THAT (1) SUBMISSION OF THIS LETTER OF TRANSMITTAL TO THE TARGET STOCKHOLDERS REPRESENTATIVE CONSTITUTES A WAIVER OF HIS, HER OR ITS RIGHT TO DEMAND PAYMENT OF THE FAIR VALUE OF HIS, HER OR ITS SHARES PURSUANT TO SECTION 262 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE AND (2) IF HE, SHE OR IT HAS PREVIOUSLY FILED A DEMAND FOR APPRAISAL WITH RESPECT TO HIS, HER OR ITS SHARES, SUBMISSION OF THIS LETTER OF TRANSMITTAL TO THE TARGET STOCKHOLDERS REPRESENTATIVE CONSTITUTES A WITHDRAWAL OF SUCH DEMAND. THE UNDERSIGNED ACKNOWLEDGES THAT HE, SHE OR IT HAS RECEIVED A COPY OF SECTION 262 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE.[18]

II. *Summary Judgment Standard*

In resolving this motion, I apply the familiar summary judgment standard.

Under that standard, the plaintiffs are entitled to partial summary judgment on their disclosure claim if they can show that there is no genuine issue of material fact precluding the court from finding that (1) the defendant directors failed to provide them with material information; and (2) the plaintiffs did not knowingly waive their right to press their disclosure claim by accepting the merger consideration on an informed basis. When examining the record to answer these questions, I must, of course, view all facts in the light most favorable to the defendant directors and draw all reasonable inferences in their favor.[19] Nonetheless, because the plaintiffs have properly supported their motion, the defendant directors must proffer record evidence sufficient to create a triable issue regarding their liability.[20]

III. *Legal Analysis*

A. *The Defendant Directors Breached Their Fiduciary Duty To Provide The GenDerm Stockholders With All Information Material To The Decisions The Stockholders Were Asked To Make In Connection With The Medicis Merger*

 In his earlier opinion in this case, Vice Chancellor Jacobs succinctly stated the pertinent principles of law relevant to whether the defendant directors breached their fiduciary duties by providing the GenDerm stockholders with deficient disclosures. Drawing on a large number of decisions, he noted:

---

for a year of the possible relevance of Pietrangelo's testimony and had failed to seek his deposition in a timely way. Similarly, I note that the defendants did not present an affidavit from Patricia Lamb or seek her deposition.

18. DX at 3.

19. *E.g., Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1375–76 (1996).

20. *E.g., In re Liquidation of National Heritage Life Insur. Co.,* Del. Ch., 728 A.2d 52, 56 *aff'd,* Del.Supr., 723 A.2d 397 (1998); *In re Gaylord Container Corp. Shareholders Litig.,* Del. Ch., mem. op. at 25, 753 A.2d 462, Strine, V.C. (2000); *Hills Stores Company v. Bozic,* Del. Ch., mem. op. at 29–30, 769 A.2d 88, Strine, V.C. (2000).

The fiduciary duty of disclosure flows from the broader fiduciary duties of care and loyalty. That disclosure duty is triggered (*inter alia*) where directors (as GenDerm's former directors did here) present to stockholders for their consideration a transaction that requires them to cast a vote and/or make an investment decision, such as whether or not to accept a merger or demand appraisal. Stockholders confronted with that choice are entitled to disclosure of the available material facts needed to make such an informed decision. Specifically in the merger context, the directors of a constituent corporation whose shareholders are to vote on a proposed merger, have a fiduciary duty to disclose to the shareholders the available material facts that would enable them to make an informed decision, *pre-merger*, whether to accept the merger consideration or demand appraisal.[21]

In *Skeen v. Jo–Ann Stores, Inc.*,[22] the Supreme Court recently confirmed Vice Chancellor Jacobs's view of the applicable standard, stating:

> In this appeal, we consider the adequacy of corporate disclosures to minority stockholders who were "cashed out" in a merger approved by the majority stockholder. The minority stockholders complain that they were not given enough financial information to decide whether to accept the merger consideration or seek appraisal. They say, in essence, that the settled law governing disclosure requirements for mergers does not ap-

ply, and that far more valuation data must be disclosed where, as here, the merger decision has been made and the only decision for the minority is whether to seek appraisal. *We hold that there is no different standard for appraisal decisions. Directors must disclose all material facts within their control that a reasonable stockholder would consider important in deciding how to respond to the pending transaction.*[23]

Without belaboring the obvious, the defendant directors did not discharge their obligation to provide the GenDerm stockholders with "the available material facts that would enable them to make an informed decision ... whether to accept the merger consideration or demand appraisal."[24] The record is clear that the defendant directors defaulted on this obligation and did not even attempt to put together a disclosure containing any cogent recitation of the material facts pertinent to the stockholders' choice. Furthermore, GenDerm did not have a certificate of incorporation that included an exculpatory provision immunizing the defendant directors from liability for the breach of the duty of care.

Given the absence of evidence that the defendant directors made any attempt to comply with their disclosure obligations, it is clear that a due care violation has been demonstrated even under the exacting gross negligence standard. Because such a violation will suffice to establish liability for monetary liability, there is no need for the plaintiffs to produce evidence that the

---

**21.** *Turner v. Bernstein I*, mem. op. at 15–16 (citing, *inter alia*, *Cinerama, Inc. v. Technicolor*, Del.Supr., 663 A.2d 1156, 1163 (1995); *Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 778 (1993) ("*Zirn I*"); *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, Del. Ch., 532 A.2d 1324, 1340 (1987); *Zirn v. VLI Corp.*, Del.Supr., 681 A.2d 1050, 1059 (1996) ("*Zirn II*")).

**22.** *Skeen v. Jo–Ann Stores, Inc.*, Del.Supr., 750 A.2d 1170 (2000).

**23.** *Id.*, 750 A.2d 1170 (emphasis added).

**24.** *Turner v. Bernstein I*, mem op. at 15–16.

failure of disclosure was purposeful or otherwise indicative of disloyalty.

B. *Is There A Genuine Dispute Of Fact Regarding Whether Turner And Richard Bernstein Waived Their Right To Relief For Breach Of Fiduciary Duty By Accepting The Merger Consideration On An Informed Basis?*

█ Vice Chancellor Jacobs denied summary judgment because, based on the undeveloped record at the time, he deemed it plausible that the defendant directors could develop evidence that plaintiffs accepted the merger consideration with knowledge of all the material facts.[25] To the extent that the plaintiffs made a "fully informed" decision to "accept[ ] the merger consideration and the other benefits of the merger," Vice Chancellor Jacobs indicated that, per *Bershad v. Curtiss–Wright Corp.* and other cases, they would "be deemed to have waived [their] right to seek appraisal or otherwise to challenge" the Medicis merger.[26]

After having had the opportunity to take discovery on the issue, the defendant directors have been unable to point to record evidence that would support a finding that either Turner or Richard Bernstein made a fully informed decision to accept the merger consideration and forego appraisal. While the defendant directors have produced evidence that suggests that neither plaintiff was a helpless ingenue who accepted the merger consideration with blind faith in the GenDerm board, the defendants have not met their burden to show that either one of the named plaintiffs made their investment decision on a fully informed basis.

1. *There Is No Evidence That Would Support A Finding That The Plaintiffs Possessed The Facts Material To Whether The Merger's Terms Were Fair To GenDerm Stockholders*

In particular, there is no evidence that either of the plaintiffs had access to such important information as GenDerm's year-to-date performance in 1997 or the board's view of its future prospects. The fact that Richard Bernstein had been provided with the company's 1995 and 1996 financials five months before the Medicis merger does not suffice to show that he had access to enough information about GenDerm's value as of December 1997[27] to make a reasoned decision whether to accept the merger consideration or seek appraisal. Indeed, the defendants' argument that the 1995–1996 financials were adequate is contradicted by the Seller's Report that Dr. Bernstein gave to Medicis, which plainly states that "GenDerm ... is a very different and a much healthier company than it was one year ago."[28] And though the named plaintiffs did discuss their investment decision with DiPrima before making it, there is no evidence that DiPrima himself possessed sufficient information to advise them as to which option to exercise.

In this regard, it is notable that earlier in this litigation the defendants implied

**25.** *Id.*, mem. op. at 23–24.

**26.** *Id.*, mem. op. at 21–22 (*citing Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 848 (1987); *Iseman v. Liquid Air Corp.*, Del. Ch., C.A. No. 9694, mem. op. at 4, 1993 WL 40048, Berger, V.C. (Feb. 11, 1993); *Siegman v. Columbia Pictures Entertainment, Inc.*, Del. Ch., C.A. No. 11152, mem. op. at 16–21, 1993 WL 10969, Hartnett, V.C. (Jan. 12, 1993)).

**27.** *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 684 A.2d 289, 299 (1996) (relevant date for fair value consideration is the date of the merger).

**28.** *See* PX 10 at MEI SR333–336.

that there were specific sources from which DiPrima could have obtained the material information.[29] Despite such arguments, however, the defendants have never produced affidavits or other evidence identifying the specific persons who supposedly gave DiPrima information. Indeed, when given the chance to ask DiPrima what information he possessed, the defendants forewent the opportunity to question DiPrima regarding whether in December 1997 he had received a copy of the Seller's Report that GenDerm gave Medicis in connection with the sales negotiations or a copy of GenDerm's results for the first ten or eleven months of 1997.

As they did earlier in the litigation, the defendants argue that the plaintiffs had been provided with phone numbers of persons to call for more information and that there was no evidence that the plaintiffs sought more information through that means. This argument is unavailing for two reasons. First, the only record evidence on this point is (i) the testimony of the plaintiff, Richard Bernstein, that he called Dr. Bernstein in December 1997 and did not receive a return phone call and (ii) the testimony of DiPrima that he called Mr. Batterson, the Kirkland & Ellis lawyer whose name was given to stockholders that same month, and was told that Batterson was on vacation. This evidence is unrebutted.

■ Second, the defendants' argument turns an affirmative duty of the directors to disclose material information into a duty on the part of the stockholders to call the company and seek the information the stockholders believe is material. The defendants cite no authority for this approach, and the policy basis for adopting it eludes me. While a board's willingness to provide additional information orally might conceivably be a factor in a close case where the board has attempted in good faith to meet its affirmative obligation to disclose all material facts, it would undermine the premise of our law's respect for *fully informed* stockholder choices if Delaware courts enabled boards of directors to default entirely on their affirmative disclosure obligations and force their stockholders to ask a series of detailed questions to elicit the material facts.[30] To accord ratification or waiver[31] effect to stockholder choices made in such an informational vacuum would, one can venture with little doubt, invite criticism from learned commentators on stockholder voting behavior and shake confidence in the basic protections afforded stockholders by our corporation law.[32] Not only that, one would be

29. *Turner v. Bernstein I*, mem. op. at 21–24.

30. *Cf. O'Malley v. Boris*, Del.Supr., 742 A.2d 845, 851 (1999) (Supreme Court reversed Chancery Court finding that a reasonable investor could not miss material facts implied by disclosures, stating that "[i]nvestors should not be required to 'correctly read between the lines' to learn all of the material facts relating to the transaction at issue"); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, Del. Ch., 532 A.2d 1324, 1340 (1987) ("The duty of candor must be discharged by the fiduciary directly to the beneficiary stockholder in the transaction itself. . . ."); *In re Trans World Airlines, Inc. Shareholders Litig.*, Del. Ch., Cons.C.A. No. 9844, mem. op. at 25, 1988 WL 111271, Allen, C. (Oct. 21, 1988) ("Nor can I agree that if a fact is material, . . . a failure to disclose it is necessarily cured by reason that it could be uncovered by an energetic shareholder by reading an SEC filing."). In a closely held corporation context where all stockholders were directors and had equal and full access to the company's information, a less formal approach might, I admit, be warranted.

31. Perhaps the term "acquiescence" might be more appropriate.

32. *Sealy*, 532 A.2d at 1340 ("Plaintiffs should not be required to make . . . choices [between accepting a merger price or seeking appraisal] in the informational vacuum into which the defendants have thrust them").

hard pressed to square such a holding with the fact that our case law values full disclosure so highly that neither reliance nor causation are required elements of a fiduciary duty claim based on inadequate disclosures.[33]

Finally, it is clear that the Medicis press releases do not contain all the facts material to the decision facing the GenDerm stockholders. Regardless, Delaware law does not relegated stockholders to relying upon information disclosed by non-fiduciaries (especially from a purchaser on the other side of the negotiating table); instead, our law entitles stockholders to receive material information from the fiduciaries they elected to represent their interests.[34]

## 2. The Fact That The Plaintiffs Waived Their Right To Proceed Under 8 Del. C. § 262 Does Not Prevent Them From Bringing An Equitable Action For Breach Of Fiduciary Duty

■ Nor does the letter of transmittal signed by Turner and Richard Bernstein preclude them from bringing an equitable action for breach of fiduciary duty. By its plain terms, the waiver in the letter of transmittal – which GenDerm drafted – only bars an appraisal action under 8 *Del.*

*C.* § 262, not an equitable action. Although the economic relief that Turner and Richard Bernstein will seek as a remedy for the disclosure violation might, I assume, be identical to a fair value award in an appraisal case,[35] our law does not infer a waiver lightly.[36] Having asked the stockholders to waive only their rights under § 262, the defendant directors are in no position to claim that the court should infer a waiver broader than that stated by the plain language of the company's own document.[37]

## 3. Even If The Plaintiffs Made A Tactical Decision To Forego Appraisal, They Are Still Entitled To Summary Judgment

In so concluding, I acknowledge that there is some equitable force behind the defendants' argument that the court is permitting sophisticated stockholders to engage in gamemanship. The defendants argue that Bernstein and Turner had every intention of suing from the get-go. Although the plaintiffs may not have had all the information they needed to make an informed decision, they possessed considerable information about transactions preceding the merger which they believed were unfair[38] and had voiced grave suspi-

---

33. *See, e.g., Malone v. Brincat,* Del.Supr., 722 A.2d 5, 12 (1998).

34. *Sealy,* 532 A.2d at 1340.

35. It is, of course, hardly novel for plaintiffs to eschew an appraisal action for the seemingly more difficult equitable action. Several features of Delaware law make the equitable action route a better one for shareholder plaintiffs. *See Andra v. Blount,* Del. Ch., C.A. No. 17154, mem. op. at 18 n. 22, 772 A.2d 183, Strine, V.C. (2000) (discussing these features).

36. *Arnold v. Society for Savings Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1289 (1994).

37. And, as the plaintiffs point out, a statutory appraisal action is different from an equitable action in several respects. In an appraisal, the defendant is the resulting or surviving corporation and is bound to pay the fair value of the petitioners' shares as determined by the court. 8 *Del. C.* § 262(i). In an equitable action, the defendants are the persons (typically the directors) who are alleged to have breached fiduciary duties owed to the plaintiffs, and the plaintiffs must prove a breach to obtain relief.

38. The plaintiffs asserted claims in their complaint challenging these transactions. Vice Chancellor Jacobs dismissed these claims as derivative. *See Turner v. Bernstein I,* mem. op. at 27–33. The claims could have been

cions regarding the quality of Dr. Bernstein's management of GenDerm. Not only that, the plaintiffs were consulting with DiPrima, their counsel and a former GenDerm CEO.

The record, the defendants suggest and the plaintiffs agree for purposes of this motion, will support the reasonable inference that the plaintiffs made the following tactical decision. Knowing that under 8 *Del. C.* § 262 they would have to wait until the litigation was concluded to receive any value for their GenDerm stock and knowing that they could not file an appraisal action on a class basis, the plaintiffs elected to take the merger consideration (the bird in hand), bank that, and then prospect for more through a breach of fiduciary duty action. Although eschewing appraisal involved waiving the right to obtain a fair price without the concomitant requirement of proving a fiduciary breach, the plaintiffs felt this was a smaller risk than in the typical case (in which it is a huge risk) because GenDerm had no exculpatory charter provision and because the defendants had completely neglected their disclosure obligations. The plaintiffs knew that if they proved a breach of fiduciary duty, the remedy would probably be to award them a fair value determination, or so-called quasi-appraisal rights. Even though the abandonment of their statutory appraisal right also prevented them from obtaining damages from Medicis as the surviving company in the merger, the plaintiffs no doubt believed that either the directors' and officers' insurance that covered the GenDerm board or the defendants' personal resources would suffice as a source of recovery. All things considered, then, the plaintiffs decided to secure the merger consideration and proceed with a fiduciary duty action.

According to the defendants, this sort of strategy is offensive to Delaware law because it invites plaintiffs to sit on disclosure claims until after a vote or stockholder choice has been made, accept the transactional consideration, and then pounce on the defendants for a disclosure violation that could have been corrected in a timely manner had the claim been pressed before closure of the transaction. Because Delaware case law favors the timely litigation of disclosure claims [39] and (at least putatively) tries to distinguish between fiduciary duty claims and appraisal claims,[40] allowing this sort of strategy undermines important public policies of our state.

Without questioning in any way the importance of these concerns, I nonetheless reject them as a basis for denying the plaintiffs the opportunity to press their disclosure claims. Several reasons underlie my decision.

First, there is no sound statutory basis to conclude that a statutory appraisal remedy is exclusive in this context. The General Assembly could easily write the language to make it so; to date, it has not.[41] As things stand, I see no rational way for Delaware courts to fashion a distinction between situations that should be litigated exclusively under § 262 and those that can be litigated through an equitable fiduciary duty action.[42] Although there are sugges-

---

**39.** *Andra*, mem. op at 15 & nn. 17 & 18, 772 A.2d 183 (citing cases).

**40.** *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1106–07 (1985).

**41.** *Andra*, mem. op at 24–25 & 24 n. 30.

**42.** *Wood v. Best, Inc.*, Del. Ch., C.A. No. 16281, mem. op., 1999 WL 504779, at *6 n. 29, Chandler, V.C. (July 9, 1999) ("In *Rabkin*, the Supreme Court recognized that its hold-

---

valued in an appraisal. *See, e.g., Bomarko, Inc., v. Int'l Telecharge, Inc.*, Del. Ch., C.A. No. 13052, mem. op. at 5–6, 1994 WL 198726, Berger, V.C. (May 16, 1994).

tions to the contrary in our decisional law,[43] those suggestions are unaccompanied by instructions as to how this court should go about this distinctional exercise. Those suggestions are, however, accompanied by language implying that whenever a board has engaged in fiduciarily unfair conduct, the stockholders should not be relegated to an appraisal proceeding.[44]

Certainly, an allegation that directors totally ignored their fiduciary duty to disclose material facts in connection with a cash-out merger would seem to raise a serious question of director fidelity "unre-

lated to judgmental factors of valuation[.]"[45] In view of the importance our law places on full disclosure,[46] it would be difficult to reconcile allowing equitable unfair dealing cases to proceed with barring equitable actions based on inadequate disclosures.

Moreover, § 262 is chock-full of disadvantages for shareholders, especially ones who own relatively small blocks.[47] Most significant, of course, is the fact that a stockholder who seeks appraisal must forego all of the transactional consideration

---

ing encouraged litigants to forgo appraisal, with its associated risks and opportunity costs, in favor of an equitable action. The *Rabkin* court placed the burden on this Court to strike a balance 'between sustaining complaints averring faithless acts, which taken as true would constitute breaches of fiduciary duties that are reasonably related to and have a substantial impact upon the price offered, and properly dismissing those allegations questioning judgmental factors of valuation,' [*Rabkin*,] 498 A.2d at 1107–08. While the Court took comfort that this Court's 'degree of sophistication' in such matters would allow performance of such a winnowing, it failed to explain how such a process could proceed in cases involving allegations of self-dealing in connection with a cash-out merger.")

43. *Rabkin*, 498 A.2d at 1107–08.

44. *Id.; Cede & Co. v. Technicolor, Inc.*, Del. Supr., 634 A.2d 345, 367 (1993) ("Under *Weinberger's* entire fairness standard of review, a party may have a legally cognizable injury regardless of whether the tender offer and cash-out price is greater than the stock's fair value as determined for appraisal purposes."); *Wood*, 1999 WL 504779, at \*5 ("For good or ill, however, as *Cede* makes clear, a colorable allegation of breach of entire fairness is sufficient to proceed with an equitable entire fairness action, despite the availability of appraisal as an alternative remedy."); *id.* at \*6 ("The current state of our corporation law is that where, as here, cashed out minority shareholders have plead facts sufficient to indicate a breach of fiduciary duty, which they seek to bring against not only the surviving corporation but against individual di-

rectors or majority shareholders as well, the plaintiffs need not demonstrate inadequacy of the appraisal remedy to survive a motion to dismiss."); *see also* Jack B. Jacobs, *Reappraising Appraisal: Some Judicial Reflections*, Speech at 15th Annual Ray Garrett, Jr. Corporate and Securities Law Institute, Northwestern University School of Law, at 12 (Apr. 27, 1995) (hereinafter *"Reappraising Appraisal"*) ("*Rabkin* held that if there was any procedural unfairness in connection with a merger, even if the only result was an unfair price, appraisal would not be adequate to remedy the wrong, and therefore, would not be exclusive. To minority stockholders, *Rabkin* offered an easy way to circumvent appraisal – by simply filing a stockholders fiduciary duty action that alleged unfair dealing.").

45. *Rabkin*, 498 A.2d at 1101; *id.* at 1108; *see also Wacht v. Continental Hosts, Ltd.*, Del. Ch., C.A. No. 7954, mem. op. at 6, 9, 1986 WL 4492, Berger, V.C. (Apr. 11, 1986) (duty of fair dealing includes "the duty of complete candor," and where complaint states a claim for breach of that disclosure duty, the "complaint adequately states a claim for unfair dealing and is not subject to dismissal on the ground that appraisal is plaintiff's exclusive remedy").

46. *E.g., Malone*, 722 A.2d 5; *O'Malley*, 742 A.2d 845.

47. See generally, *Reappraising Appraisal, passim;* Randall S. Thomas, *Revising the Delaware Appraisal Statute*, 3 DEL. L. REV. 1 *passim* (2000); *Andra*, mem. op. at 16–28, 772 A.2d 183.

and essentially place his investment in limbo until the appraisal action is resolved.[48] In many cases, the unavailability of the class action mechanism in appraisal also acts as a substantial disincentive for its use.

These factors create an incentive for plaintiffs to reject the technically easier option of an appraisal action for the more onerous burden of proving a fiduciary breach. As a judge with the legitimate authority to decide only the case before me, I have little flexibility to undertake the legislative task of re-balancing the public policy interests affected by the litigation behavior that has arisen as a rational response to the less than clear relationship between equitable fiduciary duty and appraisal actions. That is a policy-based exercise for the General Assembly.[49]

In the absence of legislative guidance, I am disinclined to find that § 262 implicitly contains an exclusivity clause depriving stockholders of their right to bring an equitable fiduciary duty claim. This does not mean that stockholder plaintiffs should be allowed to press damage claims on behalf of others when they have themselves not suffered any injury,[50] nor does it mean that stockholder plaintiffs who were fully informed should be able to accept the merger consideration and then attack the transaction.[51]

■ What it does mean is that a corporate board wishing to argue that a stockholder's acceptance of the merger consideration bars any further relief must also be willing to show that it provided the stockholder with all the information she needed to make a knowing and informed decision. If the board can meet this burden – which arguably involves less of a litigation burden than defending an appraisal action – the stockholder will, per *Bershad* and other cases, lose. If a corporate board cannot meet this burden, the board will be required to defend itself against claims that it breached its fiduciary duties and be held responsible in damages for any proven breaches (usually those not exculpated by a § 102(b)(7) provision). By enabling stockholders to hold directors accountable for such fiduciary breaches (e.g., a disclosure violation that results from disloyalty), equitable actions thus serve an independent purpose not advanced by appraisal actions under § 262.[52]

This structure is not without merit. As a matter of fairness, the current approach minimizes the likelihood that corporate boards will issue inadequate disclosures knowing that they can rely upon § 262 to exert subtle pressure on a stockholder's investment or voting decision. In a situation where a stockholder is unsure whether the transaction is unfair because the board's disclosures are arguably deficient,

**48.** *Compare* AMERICAN LAW INSTITUTE, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS & RECOMMENDATIONS, Part VII, § 7.23(c), at 336 (1992) (recommending that surviving corporation be required to pay dissenting shareholders consideration equalling fair value); MODEL BUSINESS CORPORATION ACT ANNOTATED § 13.24, at 13–76 (3d ed. 1998/99 Supp.) (same).

**49.** Given the inability of the court to rewrite § 262, I also doubt the utility of having the judiciary try to paper over the problems created by appraisal-eligible transactions. Far better that the legitimate source of authority, the General Assembly, determine *if* and *when* appraisal should be the exclusive remedy with a free hand to craft a statute that reflects its view of the relative importance of the competing values at stake.

**50.** *Andra*, mem. op. at 10–16, 772 A.2d 183.

**51.** *E.g., Bershad*, 535 A.2d at 848.

**52.** *See Rabkin*, 498 A.2d at 1108; *Wacht*, mem. op. at 6–9.

the appraisal statute creates a disincentive to use that means to challenge the transaction because the stockholder is forced to give up any immediate investment return in order to pursue appraisal. If the rule were as the defendants would have it, such a stockholder would be forced to make the Hobson's choice between pursuing appraisal and receiving no immediate return or accepting the transactional consideration and forsaking any challenge to the transaction. The current Delaware approach, which enables a plaintiff to accept the transactional consideration and to file an equitable action, subject to dismissal under *Bershad*, arguably balances the relevant public policy interests far better than the defendants' approach.[53]

Nor am I convinced, as defendants argue, that a refusal to dismiss the claims of plaintiffs Richard Bernstein and Turner will create an incentive for other stockholder plaintiffs to hold back on pressing disclosure claims in a timely way. The reality is that a great deal of representative litigation in this court is filed long before the transactions under attack are to be consummated. Such litigation frequently involves disclosure claims. Particular plaintiffs who would hold back risk much, because other sophisticated plaintiffs will likely have begun litigating the matter and shaping its destiny. Furthermore, the fact that § 102(b)(7) provisions are prevalent provides a strong incentive for plaintiffs to press disclosure claims promptly because although such provisions do not bar injunctive relief for duty of care violations, they will prevent a damages award. Thus, unless a plaintiff (and his

lawyers) are extremely confident that they possess a winning loyalty claim, they plot a dangerous path if they forego a chance to enjoin a transaction until corrective disclosures are made. Lastly, there are other tools the court can use to police the potential for abuse, which include refusing to bend the injury-in-fact requirement for representative plaintiffs who do not press disclosure claims promptly[54] and refusing to permit representative plaintiffs to raise disclosure claims for the first time after the vote, when their claims are based on information they received from the defendants well before the vote.

But in this case, the defendants' argument that the plaintiffs should have filed an injunction action seeking corrective disclosure lacks merit. The defendants themselves provided the non-management GenDerm stockholders with essentially after-the-fact notice and grossly inadequate information. It was the defendants, after all, who waived the bylaw requiring all GenDerm stockholders to receive five days business notice of any action proposed to be taken by less than unanimous written consent. Undoubtedly, this court prefers that stockholder plaintiffs bring disclosure claims promptly, particularly in situations where the plaintiffs have access to preliminary proxy materials from the Securities and Exchange Commission in advance of the company's final materials. In this case, however, the plaintiffs were confronted with a *fait accomplis*, were faced with a short deadline for making an important decision, and were given no real decisional information. That the plaintiffs' failure to bring suit a mere two months later does

**53.** The current approach affords stockholders litigation flexibility somewhat analogous to the flexibility the doctrine of independent legal significance gives corporate directors to effect transactions. *Merritt v. Colonial Foods, Inc.*, Del. Ch., 505 A.2d 757, 765 (1986) (remarking on "the broad powers and responsibilities conferred on the board of directors by

Section 141(a) of the General Corporation Law and [on] the fundamental preference for flexibility expressed in our corporation law by the doctrine of independent legal significance").

**54.** *Andra*, mem. op. at 10–16, 772 A.2d 183.

not result in a dismissal of their claims hardly creates an incentive for other stockholders to act with less than due diligence.[55]

## IV. *Conclusion*

For all these reasons, the defendants have not created a genuine dispute of material fact regarding whether the plaintiffs waived their rights to bring an equitable action by accepting the merger consideration on a fully informed basis. Therefore, given the defendants' failure to disclose the material facts, the plaintiffs are entitled to summary judgment on the liability aspect of their disclosure claim.[56]

Within seven days of this opinion, the parties shall submit an implementing order, agreed to as to form, and shall schedule a conference to set a schedule for the prompt resolution of the remedy phase of the litigation.

---

55. Because the plaintiffs did not unreasonably delay pressing their claims, the defendants' laches defense is also without merit.

56. Because I have rejected the defendants' *Bershad* argument on the merits, I do not reach the plaintiffs' contention that this defense was not fairly raised in the answer or in interrogatory responses.