# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANDREW W. LENTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0374-JTL |
| | ) | |
| SHAH MATHIAS, DEBRA MATHIAS, ROBERT CHOINIERE, BRYAN ELICKER, ROBERT TODD REYNOLD, JAMES BECKER, STEVE TROUT, JOHN W. THOMPSON, SHAHJAHAN C. MATHIAS, DONALD E. WILLIAMS, JR., KEITH DOYLE, SUHAIL MATTHIAS, JAMES KINGSBOROUGH, JOSEPH SILBAUGH, KEVIN EISENHART, KURT BAUER, PENNDEL LAND CO., a Delaware Corporation and AMERI METRO, INC., a Delaware Corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  July 7, 2022
Date Decided: July 13, 2022

Andrew W. Lentz, Plaintiff, *pro se.*

Shah Mathias, Defendant, *pro se.*

Debra Mathias, Defendant, *pro se.*

Robert Choiniere, Defendant, *pro se.*

Bryan Elicker, Defendant, *pro se.*

Robert Todd Reynold, Defendant, *pro se.*

James Becker, Defendant, *pro se.*

Steve Trout, Defendant, *pro se.*

John W. Thompson, Defendant, *pro se.*

Shahjahan C. Mathias, Defendant, *pro se.*

Donald E. Williams, Jr., Defendant, *pro se.*

Keith Doyle, Defendant, *pro se.*

Suhail Matthias, Defendant, *pro se.*

James Kingsborough, Defendant, *pro se.*

Joseph Silbaugh, Defendant, *pro se.*

Kevin Eisenhart, Defendant, *pro se.*

Kurt Bauer, Defendant, *pro se.*

Penndel Land Co., Defendant, not represented.

Ameri Metro, Inc., Defendant, not represented.


**LASTER, V.C.**

Defendant Shah Mathias[1] is the founder, CEO, Chairman, and controlling stockholder of defendant Ameri Metro, Inc. (the "Company"). For the past twelve years, the Company has been registered with the Securities and Exchange Commission (the "SEC") while remaining a pre-revenue, developmental stage entity. During that time, the Company has issued over 4.6 billion shares.

Even in an investing world that can ascribe lofty valuations to pre-revenue companies, the fact that the Company has issued such an astounding amount of equity while persisting so long as a developmental-stage entity raises questions. The Company is not an aspiring technology firm seeking to develop and bring to market a revolutionary new product or drug that has been years in the making. The Company presents itself as a construction management firm principally engaged in the development of transportation infrastructure projects, such as ports, toll roads, and high-speed trains. The Company claims to have contracts to develop a lengthy list of projects, although it has not developed any projects to date. Digging a little deeper reveals that all of the Company's contracts are with similarly pre-revenue related parties that Shah controls.

The Company does not have significant institutional backers, like brand name venture capital funds who might have investigated its potential and taken a long-term, high-

---

[1] There are several individual defendants who share the surname "Mathias." When identifying those individuals for the first time, this decision provides their full names. After that, this decision uses their first names. That stylistic choice seeks to promote clarity; it neither implies familiarity nor intends disrespect.

risk, high-reward bet. Instead, Shah has caused entities that he wholly owns or controls to sell shares of the Company's Class B stock to what appear to be retail investors. Shah's affiliates then make loans to the Company to provide it with capital.

One of the entities that Shah uses for this purpose is defendant Penndel Land Company ("Penndel"). In a typical transaction, an investor buys Class B shares from Penndel at a nominal price, such as one dollar per share. Even at that level, the pricing is suspect, given the Company's status as a pre-revenue entity that has issued over 4.6 billion shares.

The subscription agreement governing the sale has special features. One provision imposes an obligation on the part of the stockholder to sell the Class B shares into the market (the "Sale Obligation") as soon as two conditions are met. First, the Company must successfully list the Class B shares on a public exchange, and second, the trading price of the Class B shares must reach a level specified in the subscription agreement that is many thousands of times the purchase price (the "Trigger Price"). Through this mechanism, Shah creates the impression that the Class B shares have massive potential upside.

When the Sale Obligation is triggered, another provision obligates the stockholder to pay Penndel an amount equal to approximately 90% of the proceeds that the stockholder would generate by selling the Class B shares into the market at the Trigger Price (the "Payment Obligation"). The amount due under the Payment Obligation is determined by multiplying the number of Class B shares that the stockholder purchased under the subscription agreement times a price specified in the subscription agreement (the "Strike

Price"). Through this mechanism, if the conditions for the Sale Obligation ever come to pass, Penndel realizes approximately 90% of the upside on the shares.

Notably, the stockholder owes the Payment Obligation to Penndel regardless of what price the stockholder actually receives if and when the stockholder sells into the market. If the stock price were to touch the Trigger Price and then drop below the Strike Price before the stockholder sold, the stockholder would suffer a loss because the Payment Obligation would exceed the proceeds realized on the sale.

In March 2022, Shah caused Penndel and two other entities that he controls to make a tender offer to acquire the Class B shares (the "Tender Offer"). Neither Shah nor his entities have filed any formal disclosure documents in connection with the Tender Offer. The Company has filed a letter in which it states that it is facilitating the Tender Offer, and the Company has circulated documents for the Class B stockholders to return so that they can accept the Tender Offer. Shah and other defendants have sent emails to the stockholders, and they have held conference calls with the stockholders. They also have had one-on-one conversations with individual stockholders.

The information that the defendants have provided creates the impression that TDA Global Systems, LLC ("TDA Global"), a third-party investment firm, is making the Tender Offer. In fact, Shah is making the Tender Offer through Penndel and his two other affiliates.

The information that the defendants have provided creates the impression that Shah's entities are offering $4,720 for each Class B share. That number is a fiction. In fact, Shah's entities are offering to purchase the Class B shares for the difference between the Strike Price and the Trigger Price specified in each stockholder's subscription agreement.

3

The spread between those figures varies, but is generally between $100 and $300 per share. That amount is nowhere near $4,720 per share.

The little information that the defendants have provided fails to disclose key facts. For example, neither Shah nor his entities have the funds necessary to complete the Tender Offer. Shah intends to provide the funds to the extent that TDA Global turns over proceeds from the sale of a $34 billion bond that was issued by a pre-revenue, not-for-profit entity that Shah founded and controls. Shah contends that he has a right under his employment agreement with the Company to 10% of the proceeds from the bond issuance. Although Shah stresses that he has no contractual obligation to do so, he says that he intends to use some of the proceeds to fund the Tender Offer.

Plaintiff Andrew Lentz is a holder of Class B shares. In this lawsuit, he contends that the defendants have failed to disclose all material information in connection with the Tender Offer. He also contends that the defendants have made coercive threats against non-tendering Class B stockholders to induce them to tender.

The court previously issued a temporary restraining order ("TRO") barring the defendants from taking any steps to facilitate the Tender Offer. Because of the abbreviated information that the court possessed when it ruled, the court held a follow-on hearing ten days later to determine if the TRO should be renewed or modified.

This decision renews and modifies the TRO. The record establishes a colorable claim that the defendants have not fulfilled their fiduciary obligation to disclose all material information in connection with the Tender Offer. Instead, they have made misleading and at times false statements in connection with the Tender Offer.

4

The record also supports a colorable claim that the defendants have made coercive threats in connection with the Tender Offer. Most blatantly, they have told the non-tendering Class B stockholders that the Tender Offer triggers the Sale Obligation and that if they do not tender, their counterparties under their subscription agreements (such as Penndel) will sue them for the Payment Obligation. That is plainly wrong. The Payment Obligation (assuming it is enforceable) only would become due if the Sale Obligation were triggered, and that requires *both* the Company having listed the Class B shares *and* the market price of the Class B shares trading above the Trigger Price. The Company has not listed the Class B shares, so there is no stock price to exceed the Trigger Price. The nominal Tender Offer price of $4,720 per share is not a stock price. It is not even a real price. And it may not exceed the Trigger Price in any event.

Under settled principles of Delaware law, stockholders face a threat of irreparable harm when confronted with a tender offer based on false and misleading disclosures. They also face a threat of irreparable harm when confronted with coercive threats.

The defendants are restrained from taking any action to facilitate the Tender Offer. This order will remain in effect until the earlier of a decision modifying the order, a ruling on an application for preliminary injunction, or the final disposition of this action.

Because of the nature of the injunction, the defendants can seek to lift it by issuing clear and straightforward disclosure documents in which the defendants provide all material information, correct their misleading statements, and withdraw their coercive threats. Ordinarily, the court would defer to the defendants and their expert counsel to propose a suitable disclosure document. The defendants are proceeding *pro se*, and the self-

5

described securities lawyer who appeared on the defendants' behalf during the initial scheduling conference turns out to be a former New York attorney who has been disbarred from the practice of law and suspended from appearing before the SEC.

Given the defendants' problematic conduct to date, the court is conditioning any application on the part of the defendants to lift the TRO on the defendants filing the disclosure documents contemplated by the SEC regulations governing insider take-private transactions. The Company is registered with the SEC, so this is an appropriate step.

## I. FACTUAL BACKGROUND

Compared to a typical case, the factual record at this early stage is extensive, but the presentation has been less than ideal. All of the parties are currently self-represented. The entity defendants have failed to retain counsel, despite the court making clear that they were obligated to appear through counsel or face default. The *pro se* individuals have made a series of submissions to the court, supported by collections of documents that include poorly drafted agreements, emails, and affidavits. The parties also have referred the court to the public filings that the Company has made with the SEC and to the website of TDA Global. What follows represents the court's best attempt to discern what is happening at this preliminary stage.

### A. The Company

The Company is a Delaware corporation whose shares are registered with the SEC under the symbol ARMT. The Company's shares do not currently trade, and there is no market in the Company's stock.

6

The Company was formed in 2010. It acquired its public registration in 2012 through a reverse merger with Yellowwood Acquisition Corporation, a blank-check company formed in 2011 by a firm known as Tiber Creek Corporation.[2] In a Form S-1, the Company disclosed that it had retained Tiber Creek to assist the Company in going public.[3] James Cassidy, the sole owner and director of Tiber Creek, acted as the Company's attorney and rendered an opinion on the validity of the Company's shares.[4] The SEC has issued a cease-and-desist order against Tiber Creek and Cassidy on the grounds that they improperly acted as unregistered brokers for public shell companies. The SEC has barred Cassidy from practicing before the SEC.[5]

In connection with the reverse merger with Yellowwood, the Company disclosed that it was a pre-revenue, developmental stage entity. The Company explained that it

---

[2] *See* Ameri Metro, Inc., Current Report (Form 8-K) at Item 2.01 (June 15, 2012); Yellowwood Acquisition Corporation, General Form for Registration of Securities (Form 10) 1 (Nov. 9, 2011).

[3] Ameri Metro, Inc., Registration Statement Under the Securities Act of 1933 (Form S-1) 22 (Dec. 13, 2010) (the "2010 Form S-1").

[4] *Id.* at 29.

[5] *See In re Tiber Creek Corp. & James M. Cassidy*, Order Instituting Administrative Cease-And-Desist Proceedings, Release No. 85411 (Mar. 26, 2019), *available at* https://www.sec.gov/litigation/admin/2019/34-85411.pdf. The SEC also barred Cassidy and Tiber Creek "from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization" and from participating in any offering of penny stock. *Id.* IV(C)–(E). The SEC required Cassidy and Tiber Creek to disgorge $117,000.00, pay prejudgment interest of $17,697.54, and pay a civil money penalty of $75,000. *Id.* IV(H).

intended to develop projects in transportation or transportation-related fields, with a particular focus on high-speed rail.

In its most recent Form 10-K, filed on October 27, 2021, for the fiscal year ending July 21, 2021, the Company described itself as a "multifaceted emerging growth critical infrastructure and economic development company" that was a party to a "master construction agreement" for over $510 billion in construction contracts.[6] The Company represented that it and "20 related entities were formed to engage primarily in High-Speed Rail for passenger, freight transportation, and ancillary infrastructure projects such as inland ports, deep water seaports, airports, airline, toll roads, toll bridges, energy, utilities, power grid, telecommunications, technologies, housing, insurance services, media, and as mortgage banker for infrastructure projects and related transportation projects."[7]

To this day, the Company remains a pre-revenue, developmental stage entity. In the 2021 10-K, the Company disclosed that it has not generated any revenue since inception. *Id.* at 42, 46. When describing the Company's accomplishments across the twelve years since its incorporation, the Company could say only that it had "developed its business plan, appointed officers and directors, engaged initial project consultants, and had meetings with certain agencies and groups related to potential future projects." *Id.* at 4. Despite its lack of revenue and minimal accomplishments, the 2021 10-K stated that "[u]naudited

---

[6] *See* Ameri Metro, Inc., Annual Report (Form 10-K) 4 (Oct. 27, 2010) (the "2021 10-K").

[7] *Id.*

8

results of entity operations estimate Comprehensive Income of $6.938T as further described on page 81 of this 10-K." *Id.* Page 81 provides a table containing "unaudited results of operations of the [Company's] related entities for the year ending July 31, 2021." *Id.* at 81. All of the "Comprehensive Income of $6.938T" is attributed to unrealized gain on available-for-sale securities. *Id.* The Company's public filings suggest that the securities are issued by the Company and its related entities.

In a quarterly report filed on March 22, 2022, the Company disclosed that as of January 31, 2022, its current assets consisted of cash in the amount of $492.[8] In addition to that paltry sum, the Company identified an investment in a Honduras joint venture valued at $60,004,400, and "Crypto Assets" valued at $593,060,350. *Id.* The Company listed total liabilities of $89,921,172, including accrued compensation expense to related parties of $55,081,831, and accrued expenses to related parties of $1,254,562. All of these figures were unaudited. *Id.*

It is frankly impossible to provide a summary of the Company's public filings that fully conveys the contents of those documents. They contain one jaw-dropping disclosure after another.

All of the individual defendants hold roles with the Company that obligate them to act as fiduciaries for the Company and its stockholders. The court ordered all of the defendants to answer the complaint by June 30, 2022.

---

[8] Ameri Metro, Inc., Quarterly Report (Form 10-Q) at F-1 (Mar. 22, 2022) (the "March 22 10-Q").

9

Six of the individual defendants have filed answers:

- Shah is the founder, controlling stockholder, Chairman, and CEO of the Company. *See* Dkt. 41 ("Shah Ans.") ¶ 9.

- Robert Todd Reynold is the Chief Risk Officer for the Company and a member of the Company's board of directors (the "Board"). Dkt. 39 ("Reynolds Ans.") ¶ 14.

- John Thompson acts as General Counsel for the Company and is a member of its Board. Dkt. 38 ¶ 17. He has appeared in this action as a named defendant and purports to act *pro se*. As a practical matter, he has sought to make arguments on behalf of all of the defendants, including the entity defendants.

- Steve Trout is the Secretary and Treasurer of the Company and one of its directors. Dkt. 44 ("Trout Ans.") ¶ 16. Trout is Shah's brother-in-law. 2010 Form S-1 at 29.

- Debra Mathias was formerly CEO of the Company. She remains a member of its Board. Dkt. 43 ("Debra Ans.") ¶ 11. Debra is Shah's ex-wife.[9]

- Shahjahan Mathias is one of the Company's directors. Dkt. 40 ("Shahjahan Ans.") ¶ 18. Shahjahan is Shah's brother. 2010 Form S-1 at 29.

A total of ten individual defendants have not filed answers. The answering defendants admit that three of those defendants are both senior officers and directors of the Company.

- James Becker is the President of the Company and a member of the Board.[10]

- Rob Choiniere is the CFO of the Company and a member of the Board.[11]

---

[9] Ameri Metro, Inc., General Form for Registration of Securities Under the Securities Act of 1933 (Form S-1) 98 (Nov. 23, 2016) (the "2016 Form S-1").

[10] Thompson Ans. ¶ 15; Reynold Ans. ¶ 15; Shahjahan Ans. ¶ 15; Shah Ans. ¶ 15; Debra Ans. ¶ 15; Trout Ans. ¶ 15.

[11] Thompson Ans. ¶ 12; Reynold Ans. ¶ 12; Shahjahan Ans. ¶ 12; Shah Ans. ¶ 12; Debra Ans. ¶ 12; Trout Ans. ¶ 12.

10

- Bryan Elicker is the COO of the Company and member of the Board.[12]

The answering defendants admit that another four of the defendants who have not filed answers are directors of the Company. Those individuals are Keith A. Doyle, James Kingsborough, Suhail Matthias, and Donald E. Williams.[13] Suhail is Shah's cousin.[14]

The answering defendants admit that another two of the individual defendants who have not filed answers are members of the Company's Audit Committee. Strangely, the answering defendants deny that the individuals are directors of the Company. Those individuals are defendants Joseph Silbaugh and Kevin Eisenhart.[15] Assuming the Audit Committee is a committee of the Board, it is not clear how those defendants could be members of the former and not the latter.

One individual defendant is in a category of his own. Kurt Bauer has not filed an answer, and a handwritten note on Shah's answer suggests that Bauer may be deceased. *See* Shah Ans. at Caption Page. The answering defendants nevertheless admit that Bauer

---

[12] Thompson Ans. ¶ 13; Reynold Ans. ¶ 13; Shahjahan Ans. ¶ 13; Shah Ans. ¶ 13; Debra Ans. ¶ 13; Trout Ans. ¶ 13.

[13] *See* Thompson Ans. ¶¶ 19–22; Reynold Ans. ¶¶ 19–22; Shahjahan Ans. ¶¶ 19–22; Suhail Ans. ¶¶ 19–22; Debra Ans. ¶¶ 19–22; Trout Ans. ¶¶ 19–22.

[14] 2016 Form S-1 at 98.

[15] *See* Thompson Ans. ¶¶ 23–24; Reynold Ans. ¶¶ 23–24; Shahjahan Ans. ¶¶ 23–24; Shah Ans. ¶¶ 23–24; Debra Ans. ¶¶ 23–24; Trout Ans. ¶¶ 23–24.

is a member of the Audit Committee. They deny that he is one of the Company's directors.[16]

According to the Company's public filings, Shah and the Company have created an overwhelming number of affiliates, and the Company has engaged in a blizzard of related-party transactions with those affiliates. For present purposes, three entities bear particular relevance: defendant Penndel, non-party Dutch East India Logistics ("Dutch East"), and non-party Susquehanna Mortgage Bankers Corp. ("Susquehanna").

Penndel is wholly owned by Mathias. Dkt. 52 (the "Second TRO Tr.") at 55. Shah founded Penndel in 2002 as a real estate company.[17] The Company's filings consistently state that Penndel possesses "substantial assets and property," but never provide more detail than that. The Company's filings often repeat that in 2010, Penndel transferred to the Company all of its contract rights to construct a 357-mile toll road in Alabama. The contract in question is not with a third-party entity; it is with Alabama Toll Facilities, Inc. ("ATFI"), a pre-revenue, not-for-profit company that Shah formed for the purpose of seeking to construct the toll road. The Company has disclosed that ATFI would need to raise financing for design, planning, engineering, and related costs for the construction of the toll road, as well as to purchase the land where the toll road would be located. 2016 Form S-1 at 29, 34.

---

[16] *See* Thompson Ans. ¶ 25; Reynold Ans. ¶ 25; Shahjahan Ans. ¶ 25; Shah Ans. ¶ 25; Debra Ans. ¶ 25; Trout Ans. ¶ 25.

[17] 2010 Form S-1 at 26.

Shah controls Dutch East,[18] which claims to be the developer of a project intended to "provide international cargo services in Yuma Arizona."[19] Dutch East does not have "any operations or any revenue."[20]

Shah controls Susquehanna,[21] which claims previously to have been "licensed by the Pennsylvania Banking commission and HUD" as a lender.[22] As of 2021, Susquehanna was "in the process of reactivating with the State of Pennsylvania" and had applied to be a licensed lender under the U.S. Federal Reserve System.[23]

Shah currently is using these entities to make the Tender Offer. Shah historically has used these entities to issue Class B shares of common stock to investors, so this decision refers to the three entities collectively as the "Secondary Issuers."

---

[18] Before the Company's collaboration with TDA Global, described below, Shah owned 100% of Dutch East. Shah claims to have granted one of the principals of TDA Global a 50% equity interest in Dutch East. Second TRO Tr. 55–56; *see* Ameri Metro, Inc. Current Report (Form 8-K) 2 (Mar. 10, 2022) (the "March 10 8-K").

[19] 2021 10-K at 42. As with Dutch East, Shah owned 100% of Susquehanna before the Company's collaboration with TDA Global. Shah now claims to have granted one of the principals of TDA Global a 50% equity interest in Susquehanna. Second TRO Tr. 56; *see* March 10 8-K at 2.

[20] 2021 10-K at 41–42.

[21] Ameri Metro, Inc., Annual Report (Form 10-K) 10 (Nov. 12, 2020) (the "2020 10-K").

[22] *Id.* At least one filing indicates that in an earlier phase of its corporate life, Susquehanna was known as "Global Infrastructure SP Bankers." 2021 10-K at 61. Another filing states that Susquehanna acted as the Company's "Special Financial Advisor" in connection with a registration of securities in 2016. 2016 Form S-1 at 68.

[23] 2020 10-K at 10; *accord* 2021 10-K at 10 (noting that process was still ongoing).

## B.    The Company's Capital Structure

According to the financial statements in the Company's most recent quarterly report, the Company has issued a stunning number of shares. The Company currently has outstanding:

- 1,800,000 shares of preferred stock (out of 200,000,000 authorized);

- 3,284,000 shares of Class A common stock (out of 7,000,000 authorized);

- 4,289,637,884 shares of Class B common stock (out of 10,000,000,000 authorized);

- 191,051,320 shares of Class C common stock (out of 8,000,000,000 authorized); and

- 114,000,000 shares of Class D common stock (out of 114,000,000 authorized).

The Company's shares of Class A common stock carry 40,000 votes per share. The shares of Company B common stock carry one vote per share. The shares of Class C and Class D common stock lack voting rights. The Class B shares have two times the dividend rights of the Class A and Class C shares. The Class D shares have no dividend rights.

Across all classes and series, the Company claims to have issued nearly *4.6 billion shares* (4,599,773,204). Of that total, *4.2 billion* are Class B shares. Across all classes and series, the Company claims to be authorized to issue more than *18.3 billion shares* (18,321,000,000). *See* March 22 10-Q at 2, F-1.

Shah owns the super-voting Class A shares and approximately 1.2 billion shares of Class B stock. Through those shares, he controls the Company. Shah Ans. ¶ 9.

The Company has used its Class B shares to raise capital from investors under what might be described charitably as a creative financing structure. The Company has not sold

14

any Class B shares to third-party investors directly. Instead, the Secondary Issuers own substantial numbers of Company shares, and those entities raise capital from investors by selling their Class B shares to investors. To the extent that the Company needs financing, Shah causes the Secondary Issuers to make loans to the Company. Second TRO Tr. 73–74.

The Secondary Issuer that is a named defendant in this case is Penndel, and the sample subscription agreement (the "Sample Agreement") that the defendants submitted is an agreement with Penndel. *See* Dkt. 39 Ex. C. This decision therefore uses Penndel to describe the capital-raising structure that Shah has used.

Under the typical arrangement, an investor purchases Class B shares from Penndel at a nominal price, such as $1 per share. *See* Second TRO Tr. 82–83. An investor thus might pay $10,000 for 10,000 shares. *Id.* The subscription agreement describes this payment as the "Option Cost," but that term is a mischaracterization. It is actually the original issue price. The investor is not buying an option; the investor buys and therefore owns Class B shares. The so-called "Option Cost" represents the consideration that the investor pays for the Class B shares, and the recipient becomes the owner of the shares as a result of paying that consideration. *Id.* 83–84. This decision nevertheless uses the term "Option Cost."

The subscription agreement is designed to suggest the possibility of dramatic upside by contemplating a scenario in which the Company successfully lists its shares on a public exchange *and* the shares trade publicly at a specified price—the Trigger Price—set at thousands of times the purchase price. In the Sample Agreement, the Trigger Price is $5,060 per share. Dkt. 39, Ex. C at 1.

15

If the trading price hits the Trigger Price, then the Sale Obligation kicks in and the investor must sell the Class B shares into the market. There are no other conditions that limit the Sale Obligation, such as a formula that calls for a certain volume of the Company's stock to trade at or above the Trigger Price for a specified period of time. If the trading price hits the Trigger Price for an instant, then the Sale Obligation is triggered and the investor must sell into the market within the next 366 days. *Id.* at 2.

If the Sale Obligation is triggered, then the stockholder becomes liable to Penndel for the Payment Obligation, which is an amount equal to the number of shares covered by the Sale Obligation (all of the shares that the stockholder purchased) multiplied by the Strike Price. Like the Trigger Price, the Strike Price is set at many multiples of the Option Cost. In the Sample Agreement, the Strike Price is $4,559 per share. *Id* at 1.[24]

Because the Strike Price is set at such a high multiple of the Option Cost, the Payment Obligation causes the stockholder to owe a massive amount of money to Penndel. The defendants indicated that a typical investor purchases 10,000 shares for $10,000. Under a subscription agreement like the Sample Agreement, which specifies a Strike Price of $4,559 per share, the Payment Obligation is $45,590,000. The investor owes that amount to Penndel as soon as the Company's stock price hits the Trigger Price.

---

[24] The Sample Agreement actually lists two Strike Prices: $4,560.00 per share and $4,559.00 per share. The discrepancy does not matter for purposes of describing the basic design of the agreement, but it creates ambiguity and would affect the magnitude of the Payment Obligation.

In practice, this structure has enabled Shah to raise money from investors based on a promise of future market riches that is so highly unlikely as to be illusory. *See id.* at 98 ("[T]he intent was for bare minimum money, you can have some difference in your life and there's opportunity here. And this is all about opportunity . . . ."). For starters, an investor pays $1 per share for Class B stock in a pre-revenue, developmental-stage company that cannot identify any significant progress in pursuing its business model and which has issued billions of shares. It is highly unlikely that $1 per share reflects fair value. Penndel, and therefore Shah, pockets the $10,000.

The stockholder only receives a return if the Company goes public *and* the Company's shares trade at the Trigger Price. With a Trigger Price set at $5,060, as in the Sample Agreement, the stockholder only sees a return if the Company's value increases by 5,060% (assuming that $1—rather than some lower number—reflected fair value at the time of purchase).

Even then, the stockholder only receives a return per share equal to the difference between the Trigger Price and the Strike Price. All of the appreciation measured by the delta between the Option Cost and the Strike Price goes to Penndel through the Payment Obligation. Under the Sample Agreement, assuming the investor sells at the Trigger Price, Penndel receives 90% of the gains, and the investor receives 10% of the gains. If the investor sells into the market at a higher price, then the investor does better. But if the investor sells into the market at a lower price or fails to sell at all, the investor still owes the Payment Obligation to Penndel. A stockholder thus may suffer a loss on the Sale Obligation.

17

## C.     The Tender Offer

In a Form 8-K filed on March 10, 2022, the Company stated that it was providing "notice" to its Class B Stockholders through a letter dated March 9, 2022 (the "Facilitation Letter" or "FC").[25] The Form 8-K did not say what the Company was providing notice of.

The Facilitation Letter stated that the Company "is facilitating, in good faith and trust, on behalf of certain qualifying Class B shareholders, an agreement to sell their shares to a third party." FC at 1. The Facilitation Letter attached a "Tender Notice" that a Class B stockholder could fill out to tender into the offer. *Id.* at 2. A reasonable reader would conclude from this document that the Company was facilitating a tender offer by a third party.

The Facilitation Letter identified an offer price of $4,720 per share. *Id.* At that price, the offer purportedly valued the Class B slice of the Company's capital structure at $20,240,090,812,480, which is more than *twenty trillion dollars*. For comparison, the value of U.S. equity markets as a whole has been estimated as of December 31, 2021, at $53 trillion.[26] The market capitalization of Tesla Inc., as of the date of this decision, is $730

---

[25] Ameri Metro, Inc., Current Report (Form 8-K) at Item 8.01 (Mar. 10, 2022) (the "March 10 8-K"); *id.* Ex. 99.3 (the Facilitation Letter). In an amended Form 8-K dated March 10, 2022, and filed on March 11, 2022, the Company filed a revised version of the Facilitation Letter. Ameri Metro, Inc., Current Report (Form 8-K/A) (Mar. 11, 2022). The changes in the Facilitation Letter are not material.

[26] *Total Market Value of U.S. Stock Market*, Siblis Rsch., https://siblisresearch.com/data/us-stock-market-value/ (last visited July 11, 2022).

billion, down from a high of $1.06 trillion.[27] The Facilitation Letter valued the Class B equity at nearly 40% of the total market capitalization of the entire U.S. equity markets and twenty times the peak value of Tesla.

In a Form 8-K filed on March 31, 2022, the Company provided "Instructions to Stockholders" for participating in the offer.[28] The instructions advised each stockholder to execute and return to the Company a "Shareholder Equity Distribution Agreement" (the "Distribution Agreement"). Each Distribution Agreement contemplated that the stockholder would enter into a transaction with the Secondary Issuer who had sold the stockholder its shares.

Under the Distribution Agreement, the offer price of $4,720 is irrelevant. By entering into the Distribution Agreement, the stockholder agrees to the cancellation of both the stockholder's shares and the cancellation of the subscription agreement. In return, the stockholder receives a right to a payment per share from the relevant Secondary Issuer equal to the difference between the Trigger Price and the Strike Price as set forth in that stockholder's subscription agreement. The offer price of $4,720 per share has no bearing on the calculation. Under the Sample Agreement, it results in a price of $300 per share.

Investors who tender will not receive all of the money all at once. The Facilitation Letter states that stockholders who participate "shall each receive an initial payment of

---

[27] *Market Capitalization of Tesla (TSLA)*, Cos. Mkt. Cap, https://companiesmarketcap.com/tesla/marketcap/ (last visited July 11, 2022).

[28] Ameri Metro, Inc., Current Report (Form 8-K) at Item 9.01 (Mar. 31, 2022).

$50,000, and additional payments of $100,000, each 120 days until such time" as they receive their full payment. FC at 1. A stockholder who owned 10,000 shares and would be entitled to receive a total of $3,000,000 would receive an initial payment of $50,000, then twenty-nine and a half payments of $100,000, one every four months over a period of nearly ten years.

Given the payment terms, the bona fides of the parties making the offer and the status of any financing for the offer are two obvious pieces of material information. The information that the Company has provided does not address either topic.

### D. The Distraction Of TDA Global

As noted, the Facilitation Letter referred to a "third party" purchasing the shares, but did not identify who the third party was. It originally appeared that the third party making the offer was TDA Global.

From January 2022 until March 2022, the defendants played up a collaboration with TDA Global. Shah and Reynold sent emails to stockholders regarding purportedly exciting discussions between the Company and TDA Global. *See* Dkt. 39 Ex. A. When the defendants issued the Form 8-Ks that attached the Facilitation Letter and the Instructions for Stockholders, their principal focus was on agreements that the Company had entered into with TDA Global.

The Form 8-K that the Company filed on March 10, 2022, contained one sentence about the Facilitation Letter, which it attached as an exhibit. The primary focus of the Form 8-K was on describing the "TDA—Ameri Metro Collaboration Agreement Addendum" dated February 15, 2022. March 10 8-K at Ex. 99.1. The Company did something similar

20

when it filed the Instructions to Stockholders on March 31, 2022. One day later, on April 1, 2022, the Company filed an amended Form 8-K that attached a "TDA—Ameri Metro Collaboration Agreement" dated January 22, 2022 (the "Collaboration Agreement") and a "TDA—Ameri Metro Collaboration AgreementAddendum [sic]" (the "Collaboration Addendum").[29]

The parties to the Collaboration Agreement and Collaboration Addendum are TDA Global and Ameri Metro Infrastructure Cryptocurrency, Inc. ("Ameri Crypto"), a wholly-owned subsidiary of the Company. The Collaboration Agreement documents an agreement between TDA Global and Ameri Crypto to "collaborate thoroughly as full, 50%-50%, equal collaborators in the development of and implementation of cryptocurrency ('Crypto') as a useful currency in business, investment and trade." *Id.* at 1. The Collaboration Addendum provides that in pursuit of that collaboration, "the Parties hereby expressly agree that Todd Owen ('TO'), a Principal of TDA [Global] shall be added as a shareholder and/or member of all entities and/or companies owned in part or in whole by Shah Mathias, a Principal of [Ameri Metro], as listed in the attached Schedule 'A.'" Collaboration Addendum ¶ 7. The schedule lists forty-one entities. *Id.* The interests that Owen received ranged from 50% down to 12.5%. *Id.*

Lentz has provided evidence that during conference calls with investors, Shah represented that he gave up 50% of his holdings as part of the Collaboration Addendum to

---

[29] Ameri Metro, Inc., Current Report (Form 8-K/A) at Exs. 99.1–.2 (Apr. 1, 2022).

secure the Tender Offer for the Class B stockholders. *See* Dkt. 47, Ex. C at 23–24; *see also* Second TRO Tr. 60. Based on the specific figures in the Collaboration Addendum, that appears to be an exaggeration.

The Form 8-Ks and information provided by Shah and Reynold created the impression that the "third party" on whose behalf the Company was facilitating an offer was TDA Global. In his complaint, Lentz challenged the offer on that basis. During the first two hearings in the case, the defendants did nothing to correct that understanding. *See* Dkts. 17, 46.

It is now clear that TDA Global is not making the Tender Offer. Instead, Shah is causing the Secondary Issuers to make the Tender Offer. Each Secondary Issuer is making a Tender Offer to the Class B stockholders with whom it has subscription agreements.

Despite this reality, TDA Global remains a significant player. The defendants have said that the headline offering price of $4,720 per share "was determined by Shah Mathias negotiating with the investment bankers." Reynold Ans. ¶ 2; *see id.* ¶ 26. Reynold explained to the court that the "investment bankers" were representatives of TDA Global. Second TRO Tr. 57.

TDA Global is also the key to the highly contingent potential funding for the offer. When the court asked Reynold about TDA Global, he explained that TDA Global is acting as "the representative of investment bankers, broker-dealers, attorneys, and so forth in order to represent and to make it available for the bonds to be sold in the marketplace." *Id.* at 56. When the court asked about "the bonds," Shah and Reynold explained that it referred to a bond in the amount of $34 billion that has been issued by a pre-revenue, not-for-profit

company that Shah controls. TDA Global allegedly has sold the bond, but the counterparty is unknown. *Id.* at 58–60 ("Who [TDA Global's] buyer is, I don't care. I don't know."). TDA Global has not yet provided any proceeds from the bond sale. *Id.*

The proceeds from the bond sale are the source of the funds that Shah intends to use to fund the Tender Offer. Shah believes that he is entitled under his employment agreement with the Company to compensation equal to 10% of the proceeds generated by the sale of the $34 billion bond. *Id.* at 61–62 Although he stresses that he has no contractual obligation to do so, Shah intends to use a portion of the funds he believes he is entitled to receive to fund the Tender Offer. *Id.* Currently, therefore, the Secondary Issuers have no committed source of funding for the Tender Offer. All they have is the possibility that Shah will use some of his share of the proceeds from the bond sale to fund the payments. *Id.* at 61–63. None of these facts have been disclosed to the Company's stockholders.

Notwithstanding the significant role played by TDA Global in the pricing and financing of the Tender Offer, and notwithstanding the purportedly significant transactions between TDA Global and the Company's affiliates that are described in the Collaboration Agreement and Collaboration Addendum, the defendants know remarkably little about TDA Global. During the hearing on July 7, 2022, Shah and Reynold could not explain whether TDA Global had funds of its own or whether they merely acted on behalf of others. *Id.* at 69. They suggested that the court look at TDA Global's website. *See id.* at 70–71.

Shah and Reynold could not even recall the names of the humans they interacted with at TDA Global. *Id.* at 57. They recalled Owen, who is listed on TDA Global's website as "Director – Security." *Our Team*, TDA Global Systems,

23

https://www.tdaglobalsystems.com/. The website does not provide any additional information about Owen.[30]

Shah and Reynold also recalled someone named "Dan" with a last name that resembled "Lenshah." Second TRO Tr. 57. TDA Global's website does not mention a "Dan." It does identify a Leonard Chartraw, who appears to be the father of a Daniel Chartraw.[31] Daniel Chartraw previously pled guilty to wire fraud and was sentenced to four years and nine months in prison and ordered to pay $2.8 million in restitution.[32]

---

[30] Publicly available sources identify Owen as a managing member of DTEC Ventures LLC, a Nevada entity whose entity status has been revoked. DTEC Ventures was involved in two Kentucky lawsuits stemming from its acquisition of a hemp processing company and the subsequent termination of contracts that the processing company had with hemp growers. *See* Liam Niemeyer, *Over-Hyped Hemp? Amid Price Drop and a Big Bankruptcy, Some Farmers Feel Burned*, WFPL, https://wfpl.org/over-hyped-hemp-amid-price-drop-and-a-big-bankruptcy-some-farmers-feel-burned/ (Feb. 10, 2020). The lawsuits were settled. *See Lovell v. Bluegrass Bioextracts, LLC*, C.A. No. 4:20-CV-00059 (W.D. Ky. June 4, 2020); Liam Niemeyer, *Hemp Growers File Lawsuit Against Owensboro Hemp Company Alleging Fraud, Racketeering*, WKMS, https://www.wkms.org/business-economy/2020-04-13/hemp-growers-file-lawsuit-against-owensboro-hemp-company-alleging-fraud-racketeering#stream/0 (Apr. 13, 2020); Liam Niemeyer, *Settlement Reached in $69 Million Lawsuit Over Owensboro Hemp Company*, WKMS, https://www.wkms.org/business-economy/2020-02-20/settlement-reached-in-69-million-lawsuit-over-owensboro-hemp-company#stream/0 (Feb. 20, 2020).

[31] Leonard Chartraw, alongside Owen, was a managing member of DTEC Ventures. *See* Jacob Mulliken, *Buyers Named in Bluegrass BioExtracts Share History of Questionable Business Practices*, Messenger-Inquirer, https://www.messenger-inquirer.com/news/local/buyers-named-in-bluegrass-bioextracts-share-history-of-questionable-business-practices/article_f6d0fa45-19c0-5939-bfc9-ea84827e4260.html (Jan. 22, 2020) (describing complaint filed against DTEC Ventures, which was owned by Todd Owen and Leonard Chartraw, and where Daniel Chartraw was managing partner; noting that Leonard was Daniel's father).

[32] *See* Press Release, U.S. Attorney's Office for the Eastern District of California, Daniel Chartraw Sentenced in Multi-Million-Dollar Investment Fraud Scheme (Aug. 29,

**E.     This Litigation**

Shah and Reynold originally indicated to the Company's Class B stockholders that they had to return signed Distribution Agreements by April 30, 2022. Dkt. 39, Ex. C at 34. On April 28, 2022, two days before the deadline, Lentz filed this action. Dkt 1. At the time, Lentz was represented by Delaware counsel.

The complaint contained two counts. The first count asserted that the individual defendants were fiduciaries and had failed to fulfill their duty of disclosure in connection with the Tender Offer. *Id.* ¶ 46. The second count asserted that Shah, in his capacity as the Company's controlling stockholder, had breached his fiduciary duties by attempting to coerce stockholders into tendering into the Tender Offer. *Id.* ¶ 55.

Lentz filed a motion for expedited proceedings and a motion for a TRO to enjoin the defendants from completing the Tender Offer. On May 2, 2022, two days after the Tender Offer was supposed to close, Lentz asked for a hearing on the motions. Dkt. 4 at 1. Counsel represented that the Tender Offer had not closed and that Shah and other defendants were threatening Lentz and other stockholders who had not tendered their shares. Counsel's letter attached an email from Reynold which stated that in light of Lentz's lawsuit, Penndel had "no choice but to seek payment for its equity in the shares" and would

---

2013), *available at* https://archives.fbi.gov/archives/sacramento/press-releases/2013/daniel-chartraw-sentenced-in-multi-million-dollar-investment-fraud-scheme.

25

pursue "collection proceedings" unless Lentz paid the full Payment Obligation by May 10, 2022. *Id.* Ex. A at 2–3.

The court scheduled a hearing on Lentz's motions for May 6, 2022. On May 4, counsel filed verifications evidencing that process had been served on the Company and the individual defendants through the Company's registered agent. Process was served on Penndel through the Delaware Secretary of State, because Penndel had no registered agent. *See* Dkts. 8–9.

### 1. The First TRO Hearing

On May 6, 2022, the court held a telephonic hearing on the TRO application. Dkt. 12. Shah and Thompson appeared. Dkt. 17 at 4, 9. After Lentz's counsel made her presentation, Bruce S. Frank joined the call.

Frank identified himself as an "attorney from New York." *Id.* at 9. That representation turned out to be untrue. As discussed below, the court later discovered that by order dated October 28, 2010, a New York court had suspended Frank from the practice of law.[33]

During the May 6 hearing, Frank claimed that he "was just brought in today actually to consult with this because [he is] a securities attorney." *Id.* at 9. Frank's description of

---

[33] Frank was suspended "upon a finding that he constitutes an immediate threat to the public interest . . ., substantial admissions under oath, and other uncontroverted evidence of professional misconduct." *In re Bruce S. Frank, a suspended attorney*, C.A. No. 2010-00084 (N.Y. App. Div. May 24, 2011) (per curiam). Frank never filed a response, and the charges against him were deemed "established" and Frank was "disbarred on default and his name [was] stricken from the roll of attorneys and counselors-at-law." *Id.*

26

himself as a "securities attorney" turned out to be untrue. As described below, the court later discovered that by order dated June 25, 2010, the SEC had "suspended [Frank] from appearing or practicing before the Commission as an attorney."[34]

Frank's claim that he "was just brought in today" also turned out to be untrue. Emails that the parties have submitted show that Frank had provided assistance in connection with the Tender Offer since at least February 25, 2022. He appears to have been one of the principal drafters of the Distribution Agreements.[35]

During the May 6 hearing, Frank objected to the sufficiency of service of process on multiple grounds, including that "each of [the defendants] ha[d] spoken directly to the registered agent in Delaware, and the registered agent ha[d] confirmed that there was no service of any temporary restraining order motion." *Id.* at 10–11. That representation could

---

[34] *In re Bruce S. Frank, Esq.*, Order Instituting Administrative Proceedings, Release No. 62383 (June 25, 2010) [hereinafter *SEC Order*]. The SEC suspended Frank because "in violation of federal securities laws and in connection with the sale of $2.278 million of securities to approximately 13 investors, [he] promised investors that he, acting as their escrow agent, would pool their funds with other investor funds in a non-depletion account held in Switzerland where the funds would be leveraged to produce promised returns of between 10%-15%." *Id.* ¶ 3. Instead, "the funds were transferred to bank accounts in Hong Kong or used to pay promised interest payments to investors. These funds were never returned to investors." *Id.*; *see Attorney Played Ponzi on Clients, SEC Says*, Courthouse News Serv., https://www.courthousenews.com/attorney-played-ponzi-on-clients-sec-says/ (June 8, 2010). On June 25, the SEC "suspended [Frank] from appearing or practicing before the Commission as an attorney." *SEC Order* at 3.

[35] *See* Dkt. 39, Ex. A at 27 (February 25, 2022 email from Reynold to "'B SF' <bsflawnyc@gmail.com>," copying Shah, with the subject line "Equity Distribution Agreements for shareholders of AM stock."); *id.* (March 11, 2022 email from Reynold to "'B SF'" with the greeting "Good morning Bruce"); *id.* at 29 (March 17, 2022 email from Reynold to "'B SF'" with the greeting "Bruce, please see my redlined draft attached").

27

not have been true. During a hearing on June 23, 2022, Thompson told the court that the Company's registered agent was defunct. Dkt. 46 at 35.

Frank next argued that Lentz did not have standing to sue because he had declared bankruptcy and his shares had become the property of the bankruptcy estate. Dkt. 17 at 14. The court invited the defendants to file a motion on that basis. They never have.

Most significantly, Frank represented that the TRO motion was "moot" and "unnecessary" because the Company would not proceed with the Tender Offer "until this litigation is resolved." *Id.* at 12–13. The court asked Frank if the defendants would commit to giving Lentz notice of any decision to move forward with the Tender Offer. Frank undertook on behalf of the defendants to provide thirty-days' notice. *Id.* at 16.

Lentz's counsel accepted Frank's offer. Based on Frank's representations, the court denied Lentz's motions as moot. *See* Dkts. 10, 12.

### 2.      Lentz's Counsel Withdraws.

After the hearing, Shah and Reynold held a conference call with the Company's stockholders on May 8, 2022, during which Shah stated that he would "personally . . . put [Lentz's counsel's] law firm on notice" of a lawsuit. Dkt. 47, Ex. C at 26 ("You interfere, who's your insurance carrier?"). Shah and Reynold then sent an email to the Class B stockholders that circulated the email addresses for the lawyers who were representing Lentz. On May 9, Lentz's counsel informed Lentz that she had "received a bunch of emails with varying threats from shareholders" and that "[s]ome of them threaten[ed] [Lentz] as well." *Id.* at 27. In total, Lentz's counsel received at least eleven emails from stockholders. *Id.* at 27–34.

28

The emails varied in length, but each contained some iteration of the following statement:

> I would ask that you instruct your client to cease interfering in the sale of my shares—I am suffering due to your client's actions and will be seeking damages for interest lost, should he further delay the sale of my shares, and/or the full negotiated amount should he find a way to poison this deal without just cause.

*Id.* at 28; *see also, e.g.*, *id.* at 30 ("I am writing to inform you of my intent to join the lawsuit against Andrew Lentz and your law firm to seek remedy for the financial harm I will be subjected to due to Mr. Lentz's frivolous suit."). One email threatened to sue counsel for interest of 10% every thirty days on the $5 million payment that the senders understood they would receive as tendering stockholders. *Id.* at 32–33.

Counsel was prepared to continue representing Lentz, but required a meaningful retainer. Lentz could not pay the retainer, and counsel moved to withdraw. Dkts. 15, 19. On May 26, 2022, the court granted the motion. Dkt. 20.

### 3. Lentz Seeks Relief.

By letter dated May 25, 2022, Lentz notified the court that Shah and Reynold were seeking to proceed with the Tender Offer. Dkt. 21. Lentz claimed that they were violating a TRO that the court had issued. That was inaccurate, because the court had not issued a TRO. Instead, Shah and Reynold were arguably violating the undertaking that Frank had made to the court on their behalf.

In support of his request, Lentz submitted an email that Shah sent to Lentz and stockholders associated with him on May 24, 2022, in which Shah threatened to sue them if they did not tender their shares. The email stated:

29

> **IF YOU DON'T SEND YOU'RE CERTIFICATES IN AND THE PAPERWORK TO GET PAID THIS TIME:**
>
> You will find yourself being sued for the value of your shares according to the subscription agreement you signed to buy your shares from Penndel Land Co or HSRF Statutory Trust, buy Shah Mathias.
>
> An opportunity was presented to sell your shares and keep the upside and you chose not to follow through with it. Shah is giving you one last opportunity to do the right thing or you will be in court to pay millions of dollars to Penndel and HSRF Trust. Shah was very clear about this and repeated himself 4 times. Now it is up to you.

*Id.* Ex. 2 at 2. Other stockholders received threats during this period from "PeacefulShareholder <MerryShareholder@proton.me>." Dkt. 47, Ex. C at 35–37.

By letter dated May 31, 2022, Lentz sent a further update to the court. This time he reported that the defendants were threatening that "if [he] doesn't sell [his] shares within their guidelines they will sue [him] for everything below the strike price." Dkt. 24. As support, Lentz provided the following email from Reynold:

> MESSAGE TO THOSE WHO HAVE NOT "**participated** " Due to Memorial Day long weekend, I will extend you curtesy to get your paperwork in within next 10 business days period ending June10th Remember there is no buy back by Amari Metro. I will present to TDA see if they will pay anything or not. and participating in selling your shares is voluntary however if you had option then you are required to pay to the party you received shares from or face collection
>
> Let me add, please don't take this information as a threat, these are just the facts. You decide. Todd

*Id.* Ex. at 1 (highlighting in email as submitted).

On June 7, 2022, Lentz filed a third letter with the court that summarized the threats that he and other stockholders received. Dkt. 27.

30

The defendants did not respond to any of Lentz's letters. The court decided to issue an order requiring a response, and the court sought to provide notice of the order by serving it on the defendants and providing a copy to Frank. When looking for contact information for Frank's firm, the court's search immediately turned up the New York decision suspending Frank from the practice of law, the SEC order prohibiting Frank from practicing before the Commission, and an article describing Frank's defalcations. After confirming that the New York State Bar Association identified only one Bruce S. Frank and listed his status as suspended, the court contacted the Office of Disciplinary Counsel (the "ODC"). *See* Dkt. 34. The court informed the ODC that it would defer to whatever action the ODC determined to take and that the court would not take any action unless Frank sought to appear again in the proceeding.

On May 27, 2022, the court issued an order requiring that the defendants respond to Lentz's submissions on or before June 10, 2022. Dkt. 22. Although the court was unable to take the additional step of providing notice to Frank, the order was served on the Company and the individual defendants through the Company's registered agent and on Penndel through the Delaware Secretary of State. *See id.*

The defendants did not file a response. As a next step, the court ordered an in-person status conference with the parties to take place on June 23, 2022, at 11:00 a.m. Dkt. 31. The letter was served on the Company and the individual defendants through the Company's registered agent and on Penndel through the Delaware Secretary of State. The court also sent the letter to the Company's principal place of business. *Id.*

31

### 4. The June 23 Hearing

On June 23, 2022, the court held an in-person status conference. Lentz, Shah, and Thompson attended. Dkt. 46 at 2. The hearing lasted nearly two hours.

The court reported on what it had learned about Frank's status as a disbarred attorney. Thompson claimed that he was "astounded, shocked, flabbergasted, by the Court's disclosure of Mr. Frank's status. Totally unknown to me personally and to Ameri Metro. We are astounded." Dkt. 46 at 33. Thompson stated, "as soon as I can get to [it], I will do my own investigation, and I will indeed figure out where Mr. Frank came from and where he fits into all this stuff. And I will do that personally." *Id.* As noted previously, Frank appears to have been involved with the Tender Offer since at least February 25, 2022. Thompson has not followed up with the court on this issue.

The court asked Thompson about the defendants' failure to file a response as required by the court's order dated May 27, 2022. *Id.* at 35. Thompson claimed that none of the defendants had received the order. It was at this point that he represented that the Company's registered agent was defunct, contradicting Frank's earlier statement that he had spoken with the registered agent.

Lentz renewed his request for a TRO, and Thompson and Shah opposed that request. After hearing extensive presentations from both sides, the court issued the TRO enjoining the defendants from taking any action to facilitate the Tender Offer. *See* Dkt. 32 ¶ 4. Crediting the defendants' assertion that they had not had a full opportunity to prepare for the hearing because of problems with their registered agent, the court limited the duration

of the TRO to ten days. The court set a hearing on July 7, 2022, to determine whether the

TRO should be renewed, modified, or converted into a preliminary injunction. *Id.* ¶ 7.

The court also entered a schedule to establish an orderly process for submissions

leading up to the hearing.

- The defendants were required to answer the complaint by 5:00 p.m. on June 30, 2022.

- The defendants could file an opening submission contemporaneously with their answer.

- Lentz would file his response on July 5, 2022.

- The defendants would file any reply on July 6, 2022.

*See id.* ¶ 9. By structuring the proceedings in this fashion, the court gave the defendants

two briefs to Lentz's one.

The parties did not comply with the scheduling order.

- On June 30, 2022, Lentz submitted a letter reporting on a conversation he had with Thompson. Dkt. 36. The schedule did not contemplate that submission.

- Also on June 30, 2022, Thompson filed an answer and an opening submission. *See* Dkts. 37–38. Both filings appeared to be on behalf of all defendants. *See* Dkt. 37 (titled "DEFENDANTS [sic] BRIEF FOR TRO HEARING"); Dkt. 38 (titled "DEFANDS [sic] ANSWER TO PLAINTIFF'S COMPLAINT"). Thompson, a Pennsylvania lawyer, thus appeared to be acting as counsel in a Delaware proceeding, which is something he cannot do without being admitted *pro hac vice*. Alternatively, he was only acting for himself, in which case none of the other defendants complied with the scheduling order.

- On July 1, 2022, Reynold filed an answer titled "Post Follow Up to the Status Hearing – Answers to the Nature of the Action in the Interest of Transparency and Clarity from Robert Todd Reynold." Dkt. 39. Reynold submitted seven exhibits, two of which consisted of compilations of emails and attachments. *Id.* Exs. A, D. Most of the emails contained highlighting and handwritten notations. The filing came a day after the deadline for the defendants to answer.

33

- On July 5, 2022, Shahjahan, Shah, Debra, and Trout filed separate answers to Lentz's complaint. *See* Dkts. 40–45. Trout actually filed two answers. Dkts. 44–45. The filings came five days after the deadline for the defendants to answer.

- On July 6, 2022, Lentz filed a response to the defendant's submissions. Dkt. 47. That response was a day late.

- Also on July 6, 2022, two hours after Lentz's submission was filed, Thompson filed a further response. Dkt. 48. Thompson appeared to be submitting the response on behalf of Shah, Trout, Debra, Shahjahan, and himself. *Id.* at 4. As someone who is not a Delaware lawyer, Thompson could not represent anyone but himself.

- On July 7, 2022, four hours before the scheduled hearing, Trout filed a supplemental submission that attached twenty-eight affidavits from Company stockholders. Dkt. 49. The scheduling order did not contemplate those submissions.

Although unwieldy, poorly organized, and largely submitted in violation of the scheduling order, the submissions provided the court with a considerable amount of information. Most notably, the defendants took a clear position that the Tender Offer was not a third-party offer. It was rather an offer that Shah was making through the Secondary Issuers.

### 5. The July 7 Hearing

On July 7, 2022, the court held a hearing to consider whether to renew the TRO. Lentz, Reynold, Thompson, and Shah appeared and made presentations. The hearing lasted nearly two and a half hours.

During the hearing, the defendants confirmed that Shah is causing the Secondary Issuers to make the Tender Offer. Second TRO Tr. 53–54. They confirmed that Penndel is wholly owned by Shah and that he controls the other two Secondary Issuers. *Id.* at 54–56.

As discussed previously, Shah admitted during the hearing that he does not have any committed financing for the Tender Offer. He represented that to the extent TDA

34

Global provides proceeds from the sale of the $34 billion bond issuance, he believes he is entitled to 10% of the proceeds under his employment agreement with the Company and he plans to use a portion of those funds to finance the Tender Offer. Shah stressed that he had no obligation to do so. *See id.* at 59–64. Shah and Reynold also revealed that the Secondary Issuers are simultaneously agreeing to purchase shares of one of the Company's subsidiaries on a one-off basis, if the stockholders happen to send in the shares by mistake. *Id.* at 100–09.

During the hearing, Reynold claimed that a stockholder's obligation to sell under a subscription agreement could be triggered by anyone making an offer at a price that exceeded the Trigger Price. *Id.* at 82. He contended that there were no requirements or conditions that the offer had to meet, such as being fully financed or from a credible bidder. Any offer would be sufficient; a number written on a napkin would suffice. *Id.* at 87–89.

During the hearing, Reynold claimed that he and Shah "never told anyone to sue anyone." *Id.* at 65. That is obviously untrue. In his pre-hearing submission, Reynold provided emails containing the threat and wrote beside those threats that they were accurate descriptions of Penndel's rights under the subscription agreements. Reynold Ans. Ex. A. During the hearing, however, Shah and Reynold admitted that there is no provision in the subscription agreements that gives the Secondary Issuers the right to sue a stockholder for the Payment Obligation if a stockholder declines to tender into a tender offer that does not exceed the Trigger Price. *Id.* at 90–97. Shah and Reynold could not even explain why the Sale Obligation, which was premised on the existence of a trading market, would apply to the Tender Offer. *Id.* at 97–98.

During the hearing, Reynold represented that he had provided the court with all of the email communications that he had sent to the Company's stockholders in connection with the Tender Offer. *See id.* at 65, 67, 71–78, 80. He claimed that the email communications, the conference calls that he and Shah led, and the Company's filings with the SEC provided stockholders with all material information concerning the Tender Offer. *Id.* at 72, 99–100, 110–12.

At the end of the hearing, the court extended the TRO for ten days so that the court could issue a decision. *Id.* at 117.

## II.     LEGAL ANALYSIS

"A temporary restraining order is a distinctive remedy of a court of equity. It is not a preliminary injunction masquerading under another name and the legal test for its issuance, while involving similar elements to the test for a preliminary injunction, involves . . . a materially different emphasis." *Cottle v. Carr*, 1988 WL 10415, at *2 (Del. Ch. Feb. 9, 1988) (Allen, C.). When assessing whether a TRO is warranted, "the Court is generally guided by three factors: (i) the existence of a colorable claim, (ii) the irreparable harm that will be suffered [by the moving party] if relief is not granted, and (iii) a balancing of hardships favoring the moving party." *CBOT Hldgs., Inc. v. Chi. Bd. Options Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007). Of the three factors, irreparable harm is the most important; it is the *sine qua non* for this form of relief. *Cottle*, 1988 WL 10415, *6.

36

## A. A Colorable Claim

Lentz contends that the defendants are breaching their duty of disclosure in connection with the Tender Offer. Lentz also contends that the defendants are breaching their fiduciary duties because the Tender Offer is coercive. "For the purposes of an application for a temporary restraining order, the analysis of whether the claims asserted are meritorious generally requires nothing more than a showing that a colorable claim has been made out if the facts alleged are true." *Mitsubishi Power Sys. Ams., Inc. v. Babcock & Brown Infrastructure Gp. US, LLC*, 2009 WL 1199588, at *3 (Del. Ch. Apr. 24, 2009) (cleaned up). Lentz has cleared that bar by a wide margin.

### 1. The Disclosure Claim

Fiduciaries of a Delaware corporation owe a duty of disclosure when asking stockholders to make an investment decision, such as whether to tender into a tender offer. *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 16–17 (Del. Ch. 2014). The duty of disclosure is not an independent duty, but rather derives from the core fiduciary duties of loyalty and care. *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009). The duty of disclosure is a context-specific application of the unremitting duties that a fiduciary owes under Delaware law. *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001).

Directors of a corporation are fiduciaries. It is elementary that if the directors of a corporation cause the corporation to make a tender offer for its shares, the directors have a duty to provide stockholders with information in connection with the offer. *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1057 (Del. Ch. 1987).

37

Officers of a corporation are fiduciaries who generally owe the same duties as directors (in addition to owing additional duties as corporate agents). *See generally Metro Storage Int'l LLC v. Harron*, — A.3d — , 2022 WL 1404359, at \*19–22 (Del. Ch. May 4, 2022) (collecting authorities). Consequently, if a corporation makes a tender offer for its shares, then the duty of disclosure applies to the officers as well. *See Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009) (applying duty of disclosure to officers). Officers, of course, are in a somewhat different situation because they report to the board. *See Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at \*21 (Del. Ch. Jan. 13, 2020) ("Officers also are fiduciaries in their capacities as agents who report to the board of directors."), *aff'd*, 243 A.3d 417 (Del. 2020). At a minimum, to satisfy their fiduciary obligations, officers must disclose fully and fairly all material information within their control to the board, so that the board can determine whether to disclose it to stockholders.

A party that controls a corporation is also a fiduciary under Delaware law. *See Voigt v. Metcalf*, 2020 WL 614999, at \*9–13 (Del. Ch. Feb. 10, 2020) (collecting authorities). A controller therefore owes a duty of disclosure when asking stockholders to make an investment decision. *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 279 (Del. 1977); *Solash v. Telex Corp.*, 1988 WL 3587, at \*11 (Del. Ch. Jan. 19, 1988).

The duties that directors and officers owe do not apply only to tender offers that the corporation initiates. The directors and officers of a Delaware corporation have an affirmative obligation to respond to threats to the corporation and its stockholders. *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (explaining that when a board of directors confronted a hostile tender offer, it was obligated to protect the

38

company's stockholders; stating "[t]hus, we are satisfied that in the broad context of corporate governance, including issues of fundamental corporate change, a board of directors is not a passive instrumentality"). Consequently, if a controller makes a tender offer for the corporation's shares (whether directly or through affiliates), then the duty of disclosure falls on both the controller making the offer and on the directors and officers of the corporation who must evaluate and respond to the offer.

"Corporate fiduciaries can breach their duty of disclosure under Delaware law by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading." *Pfeffer*, 965 A.2d at 684 (cleaned up). The same principles apply to other fiduciaries.

When deciding whether information is material, Delaware law applies the federal standard for materiality. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting materiality standard from *TSC Industries, Inc. v. Northway, Inc.*, 426 U. S. 438 (1976)). Information is material if there is a "substantial likelihood" that the information "'would have assumed actual significance in the deliberations' of a person deciding whether to buy, sell, vote, or tender stock." *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004) (quoting *Rosenblatt*, 493 A.2d at 944), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE). The test does not require "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote," *Rosenblatt*, 493 A.2d at 944 (cleaned up), or not tender the investor's shares. Rather, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by

the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (cleaned up).

The scope of what information is material expands when either the corporation engages in a self-tender. The reasons for the heightened duty are twofold. First, "the disclosures are unilateral and not counterbalanced by opposing points of view." *Eisenberg*, 537 A.2d at 1057. Second, the transactions by their very nature carry "built-in conflicts of interest." *Id.* Consequently, "the strictest possible standard of disclosure" applies. *Id.*; *see Blanchette v. Providence & Worcester Co.*, 428 F. Supp. 347, 356 (D. Del. 1977). The same reasoning applies when a controller or its affiliates make a tender offer for a corporation's shares. Notably, the overarching test for determining materiality does not change. *See Barkan v. Amsted Indus.*, 567 A.2d 1279, 1288 (Del. 1989) (holding that there is a single standard for assessing materiality). What changes is the contextual application of that standard. A fact may take on greater significance and hence be material in a controller tender offer when that same fact might not be material in a third-party deal.

In *Eisenberg*, this court identified three baseline requirements. First, stockholders "are entitled to an accurate, candid presentation of why the self-tender offer is being made." 537 A.2d at 1059. Second, stockholders "are entitled to be informed of information in the fiduciaries' possession that is material to the fairness of the price." *Id.* Stockholders are entitled to receive an even-handed presentation of the economic merits of the offer. *Id.* at 1060. Stockholders are also entitled to receive an explanation of how those factors played into the fiduciary's decision to make or respond to the offer. *Id.* Third, stockholders are entitled to information about any potential conflicts of interest that the fiduciaries face. *Id.*

40

at 1160–61. Subsequent decisions have held that stockholders are entitled to know the source of funds for the offer and whether any financing is fully committed. *See Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 158 (Del. 1997) (affirming finding that the source of funds was adequately disclosed); *Davidow v. LRN Corp.*, 2020 WL 898097, at *11 (Del. Ch. Feb. 25, 2020) (finding it reasonably conceivable that the source of funds was not adequately disclosed).

In two decisions issued while serving on this court, Chief Justice Strine addressed disclosure failures by fiduciaries that had provided their stockholders with virtually no information when asking the stockholders to make an investment decision. *See Nagy v. Bistricer*, 770 A.2d 43 (Del. Ch. 2000); *Turner v. Bernstein*, 776 A.2d 530 (Del. Ch. 2000). In *Turner*, the directors of a Delaware corporation also controlled a majority of the corporation's voting power, and they used their control to cause the company to sell itself to a third party, with the directors approving the transaction by written consent. 776 A.2d at 534. After the merger closed, the directors circulated materials to stockholders so they could either accept the merger consideration or seek appraisal. *Id.* The disclosure document provided the stockholders with "extremely cursory information." *Id.* at 532. The directors "did not give the stockholders any current financial information or explain why the merger was in [their] best interests." *Id.* The stockholders "did not even receive the company's most recent financial results for the periods proximate to the vote," nor "any projections of future company performance," nor "any explanation of why the [company's] board believed that the merger consideration [should be accepted]." *Id.* at 535. The court granted summary judgment to the plaintiffs, holding that the duty to disclose all material

41

information applied and that the directors "defaulted on this obligation" where they "did not even attempt to put together a disclosure containing any cogent recitation of the material facts pertinent to the stockholders' choice." *Id.* at 542.

In *Nagy*, the directors and controlling stockholders effected a merger between a corporation and another entity that they controlled. 770 A.2d at 47. As in *Turner*, they distributed a disclosure document that provided minimal information. The court observed that "[a]lthough the Information Circular contained a good deal of information about how to perfect appraisal rights and the nature of an appraisal proceeding under § 262, the Information Circular was wholly devoid of other material information." *Id.* at 48. The court noted that the disclosure document (i) did not provide any financial information about the buyer or the seller; (ii) did not describe the process or events leading to the merger, (iii) did not describe why the seller's board had agreed to the merger, and (iv) contained no information regarding the fact that the seller's controllers held a controlling interest in the buyer. *Id.* Despite the lack of information, the defendants argued that the plaintiff had failed to state a disclosure claim. The court bluntly rejected that argument.

> This argument is fatuous. The Information Circular contains NO information from which [the plaintiff] would have any idea of the value of [the buyer] or [the seller]. The Information Circular contains NO information regarding the reasons [the defendants] supported the Merger as directors of [the seller], or the process that they used in coming to their decision to support the Merger. The Information Circular contains NO information regarding [the defendants' controlling] interest in [the buyer].

*Id.* at 60. The court granted summary judgment in favor of the plaintiffs, holding that "[i]nformation of this kind is self-evidently material" and the failure to provide the plaintiff

"with *ANY* information in these categories was a breach of [defendants'] fiduciary duties." *Id.*

In this case, Shah has caused the Secondary Issuers to make the Tender Offer. Shah is the founder, CEO, Chairman, and controller of the Company. He therefore owes a duty of disclosure in connection with the Tender Offer. The other defendants plainly owe fiduciary duties as well. Shah, Reynold, Thompson, Trout, Debra, Shahjahan, Becker, Choinier, Elicker, Suhail, Kinsborough, Williams, and Doyle are directors of the Company and owe a duty of disclosure in that capacity. Shah, Reynold, Thompson, Trout, Becker, Choiniere, and Elicker are officers of the Company and owe a duty of disclosure in that capacity. Silbaugh, Eisenhart, and Bauer are members of the Audit Committee, making it reasonably likely that they are also directors and owe fiduciary duties in that capacity, even though the answering defendants claim they are not directors.

Lentz has more than demonstrated that his disclosure claim is colorable. The facts in this case are worse than *Turner* and *Nagy*, because Shah and the Secondary Issuers have never attempted to provide the stockholders with an offer to purchase or similar disclosure document containing the material information that they need to make a decision regarding the Tender Offer. The directors and officers have not provided stockholders with a clear disclosure document either, such as a response to the Tender Offer.

Rather than preparing and circulating clear disclosure documents, the defendants have provided substantive information about the Tender Offer through a jumble of emails and a series of conference calls. Shah and Reynold have been the principal communicators, and their emails have consisted primarily of confusing hype about the Company's

43

interactions with TDA Global. They have made similar statements orally during the conference calls.

The Company has provided stockholders with a set of barebones documents to effectuate the Tender Offer, consisting of the Facilitation Letter, the Tender Notice, and the Instructions to Stockholders. Those documents are poorly drafted and ambiguous. At best for the defendants, they are comparable to the inadequate documentation provided in *Turner* and *Nagy*. In those cases, the disclosure violations were so obvious that the court entered summary judgment against the defendants.

Conspicuously absent from the disclosures are clear statements addressing items required by Delaware law, such as:

- the offeror's view of the value of the Class B common stock;

- the offeror's view of the value of the Company;

- the pricing mechanism for the Tender Offer;

- how the pricing mechanism was determined;

- the identity of the parties involved in determining the pricing of the Tender Offer;

- the source of the funding for the Tender Offer;

- the background facts regarding the process that led to the Tender Offer;

- current financial information regarding the Company;

- the position of the Board regarding the Tender Offer;

- the reasons for the Board's position;

- the Board's view of the value of the Class B common stock; and

- the Board's view of the value of the Company.

44

The defendants cannot claim that the stockholders have current financial information through the Company's filing of quarterly reports. During the period of time that the Tender Offer has been outstanding, the Company delayed filing its second quarter financial statements.

Shah, the Secondary Issuers, and the other defendants also have failed to provide stockholders with specific facts about the Tender Offer that are plainly material, such as:

- The fact that the Secondary Issuers have no committed financing for the Tender Offer.

- The fact that Shah is not contractually bound to fund the Tender Offer and merely intends to do so voluntarily.

- The fact that Shah does not currently have the funds necessary to complete the Tender Offer.

- The fact that the funds Shah plans to use to complete the Tender Offer will be generated from his share of the proceeds of the sale of a $34 billion bond issued by a pre-revenue, not-for-profit entity that Shah controls.

- The fact that TDA Global is solely responsible for selling the $34 billion bond, and although the defendants claim TDA Global has sold it, they do not know the buyer, cannot find out who the buyer is, and have not received any proceeds.

At the same time, Shah and Reynold have made statements to the stockholders that are plainly untrue.

- They have stated incorrectly that unnamed investment bankers are the buyers in the Tender Offer. The Secondary Issuers are the buyers.

- They have stated incorrectly that the price of the Tender Offer is $4,720 per share. The offer price is the difference between the Trigger Price and the Strike Price as specified in each Class B stockholder's subscription agreement. The difference ranges from $100 to $300 per share.

- They have stated incorrectly that Shah negotiated the Tender Offer price of $4,720 with the investment bankers. The offer price was not negotiated. It is the difference

45

between the Trigger Price and the Strike Price as specified in each Class B stockholder's subscription agreement.

Most glaringly, Shah and Reynold have asserted that the subscription agreements obligate stockholders to tender into the Tender Offer and that the stockholders will be liable for the Payment Obligation if they do not tender. Neither assertion is true. The Sale Obligation presumes the existence of a trading market for the Company's shares *and* a trading price that has exceeded the Trigger Price. There is no trading market for the Company's shares and no trading price that could trigger the Sale Obligation. The Tender Offer's pretend price of $4,720 per share is not a market price that could trigger the Sale Obligation. It is also below some of the Trigger Prices. Most importantly, it is also not a real price. The actual offer price is the difference between the Trigger Price and the Strike Price as set forth in each stockholder's subscription agreement, which is $100 to $300 per share. That figure is nowhere near the multi-thousand dollar Trigger Prices that are in the subscription agreements.

Equally important, there is no provision in the subscription agreement that requires stockholders to sell if the Sale Obligation is not triggered. During the hearing on July 7, 2022, none of the defendants could point to such a provision. Any claim to enforce the subscription agreements against a stockholder that did not tender into the Tender Offer would be frivolous. There is also a good argument that the Payment Obligation operates as an unconscionable penalty.

Lentz has stated a colorable claim for breach of the duty of disclosure.

46

## 2. The Coercion Claim

A fiduciary cannot take action that coerces the fiduciary's beneficiaries into following a course of action that the fiduciary prefers. "By doing so, the fiduciary acts disloyally and violates the standard of conduct expected of fiduciaries. The fiduciary may only avoid a finding of breach by proving that the transaction was nevertheless entirely fair, notwithstanding the fiduciary's use of coercion." *In re Dell Techs. Inc. Class V S'holders Litig.* (*Dell Class V*), 2020 WL 3096748, at *23 (Del. Ch. June 11, 2020); *see AC Acqs. Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 112–13, 115 (Del. Ch. 1986) (explaining why partial self-tender was coercive and constituted a breach of fiduciary duty unless the defendants could prove it was entirely fair).

One way that a fiduciary can coerce stockholders is by threatening to make their situation worse if they do not do what the fiduciary wants. *Dell Class V*, 2020 WL 3096748, at *25. Framed generally, the operative test is whether the fiduciary has taken action that causes stockholders to act—whether by voting or making an investment decision like tendering shares—for some reason other than the merits of the proposed transaction.[36]

---

[36] *Id.*; *see Williams v. Geier*, 671 A.2d 1368, 1382–83 (Del. 1996) ("Wrongful coercion may exist where the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction."); *Weiss v. Samsonite Corp.*, 741 A.2d 366, 372 (Del. Ch.) ("A tender offer that is 'actionably' or 'wrongfully' coercive is one that . . . induces shareholders who were the victims of inequitable action to tender for reasons unrelated to the economic merits of the offer."), *aff'd*, 746 A.2d 277 (Del. 1999) (TABLE); *see also In re Marriott Hotel Props. II Ltd. P'ship*, 2000 WL 128875, at *18 (Del. Ch. Jan. 24, 2000) (dismissing coercion claim at pleading stage where complaint did not allege a

Tailored to a tender offer, the question is whether "the defendants have taken actions that operate inequitably to induce the [stockholders] to tender their shares for reasons unrelated to the economic merits of the offer." *Eisenberg*, 537 A.2d at 1061.

This court has found that a self-tender was coercive where the fiduciaries controlling the corporation caused stockholders to perceive "not unreasonably, that unless they tender, they may not realize any return on or value for their investment in the foreseeable future." *Id.*; *accord Davidow*, 2020 WL 898097, at *12; *see Lacos Land Co. v. Arden Gp., Inc.*, 517 A.2d 271, 278–79 (Del. Ch. 1986). Delaware law recognizes that threats of litigation can result in wrongful acts for purposes of a claim of coercion or duress in a bilateral negotiation. *See, e.g.*, *Bakerman v. Sidney Frank Imp. Co.*, 2006 WL 3927242, at *16 (Del. Ch. Oct. 10, 2006). A threat by a controller or his affiliates to sue minority stockholders if they do not tender can therefore render a tender offer inequitably coercive.

Lentz has more than demonstrated that his coercion claim is colorable. The record demonstrates that the defendants have repeatedly threatened Lentz and the other stockholders who have not tendered their shares in an effort to force them to consummate the Tender Offer.

The Facilitation Letter evidences the kind of threat that was found problematic in *Eisenberg* and *Lacos Land*. It stated: "The Company expressly represents that a further opportunity to liquidate Class B shares at the agreed upon share price may not be available

---

"threatened bad consequence resulting from the conduct of [the defendants] that compelled a decision to tender").

48

again in the future." FC at 2. In a different case, this statement could be innocuous. In this case, it is part of a pattern of threats.

In addition to the statement in the Facilitation Letter, Shah and Reynold threatened non-tendering stockholders with litigation. In an email dated April 29, 2022, Reynold warned stockholders who had not tendered that if they did not sign the Distribution Agreements, then "[t]he share price you purchased the shares on your subscription agreement times the number of shares optioned is due and payable by May 10th, 2022," and that Penndel will resort to "collection proceedings in equity court." Dkt. 4, Ex. A at 3. Similarly, in a May 24, 2022 email, Reynold threatened that if stockholders did not submit their "certificates" and "paperwork" by May 31, then Shah would sue them for "the value of [their] shares." Dkt. 21, Ex. 2 at 2 (cleaned up). The email continued with the warning: "Shah is giving you one last opportunity to do the right thing or you will be in court to pay millions of dollars to Penndel and HSRF Trust." *Id.* And in a May 29, 2022 email to stockholders, Reynold cautioned that "participating in selling your shares is voluntary however if you had [the] option then you are required to pay to the party you received shares from or face collection." Dkt. 25.

Shah made similar threats during calls with stockholders. Lentz has submitted a transcript of a call on March 3, 2022, during which Shah told stockholders that "from this day on, there should be no communication about your shares [or] your holdings with anyone else" and "do not call each other and talk about it." Dkt. 47, Ex. B at 6 (cleaned up). He continued "[i]f you want to get paid stick with the program and you will get paid." *Id.* at 7 (cleaned up). During a call on May 24, Shah threatened that "for those who did not

49

turn their documents in, as everybody was required, I'm going to give you one more freaking chance. And I'm saying that, because otherwise, I'm going to be litigating each one of you for getting my shares back . . . ." Dkt. 30 at 2 (cleaned up). Later in the call, he warned stockholders who had not tendered to "reconsider your position because I'm going to come after you to collect the shares." *Id.* at 3 (cleaned up).

As discussed in the preceding section, there was no legal basis for Shah and Reynold to make these threats. They were not describing accurately what would happen under the subscription agreements if the stockholders did not tender. They were making stuff up to bully the stockholders into tendering.

Lentz has stated a colorable claim that the defendants made coercive threats in connection with the Tender Offer.

## B.    Irreparable Harm

Irreparable harm exists when a remedy at law would prove inadequate. "[T]his Court has explicitly held that a breach of the disclosure duty leads to *irreparable harm.*" *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360 (Del. Ch. 2008). On top of that, a stockholder's right to make an informed, uncoerced decision in a tender offer "is specific, and its enforcement requires a specific, not a substitutional, remedy." *Eisenberg*, 537 A.2d at 1062. Permitting a deficient offer to go forward would "forever deprive the tendering shareholders of their right to be treated fairly." *Id.* Although a court might attempt to remedy the injury to some degree with a damages award, the court could not restore the stockholders' right to make their own decisions, and damages would not be a fully adequate remedy. *Id.*

50

In this case, the disclosures made in connection with the Tender Offer were clearly deficient. The Tender Offer is also coercive. A threat of irreparable harm exists.

## C.       The Balancing Of Hardships

The final question is whether a balancing of hardships warrants the issuance of relief. The basic question is whether the risk of an improvidently granted order outweighs the risk of denying the application. *Mitsubishi*, 2009 WL 1199588, at *5. "In other words, if the immediate and irreparable harm to be averted by the issuance of a temporary restraining order outweighs the burden to be suffered by the non-moving party through maintenance of the status quo, then the Court is more likely to grant such an equitable remedy." *CBOT*, 2007 WL 2296356, at *5. In conducting this inquiry, the court weighs the threatened harm to Lentz and other non-tendering stockholders against the harm that a TRO would impose on the defendants and stockholders who want to tender their shares.

Lentz has presented more than colorable claims and established a clear threat of irreparable harm. His showing weighs strongly in favor of a TRO.

Shah and the Secondary Issuers have not identified a compelling interest in completing the Tender Offer. They have no right to complete an offer on the basis of inadequate disclosures and coercive threats. There also does not appear to be any temporal urgency to the Tender Offer. The Company has been a pre-revenue entity for twelve years. Nothing has changed. The pricing of the Tender Offer is not tied in any way to the current status of the Company or its business. The price is based on two numbers in subscription agreements that the stockholders signed when they purchased their shares. Nor are there other meaningful risks to Shah and the Secondary Issuers from delay, such as a potential

loss of financing. They do not have the funds to complete the Tender Offer, and their access to funds depends on proceeds from the sale of a $34 billion bond issued by a pre-revenue not-for-profit entity that Shah controls.

The more important consideration is the stockholders who have executed Distribution Agreements. The defendants argue that the court should not issue a TRO because "385 stockholders of approximately 432 have submitted their paperwork to get paid" and "forestalling 385 people from getting paid should be of great concern" to the court. Dkt. 37. That is indeed a serious concern, and the court has taken it seriously.

Given that the offer appears to be coercive and that stockholders have not been provided with material information, the level of stockholder support is an unreliable indicator. The stockholders who have tendered have done so without adequate information and in a coercive environment. Because of these factors, the Tender Offer is not voluntary, and the expression of stockholder choice is unpersuasive.

Taking a step back, it is worth pondering what really might be going on here. The Company has remained a pre-revenue, developmental stage entity. One possibility is that the Company lacks any meaningful assets that would offset its substantial liabilities to related parties. Viewed from that perspective, the Company is insolvent and its equity is worth nothing. At best, its shares are worth cents on the dollar. Under that state of the world, for an investor to get $300 for a Class B shares seems like a great deal. It might even be too good to be true.

Another possibility is that the grandiose statements in the Company's disclosures are accurate. In that case, the Company has huge potential, and the Class B shares might

be worth more than $300 per share. Under that state of the world, by causing the Secondary Issuers to repurchase the shares, Shah is buying low, and the investors would lose out by tendering.

One might think that the shares must be worth something, because it would be irrational for Shah to cause the Secondary Issuers to pay $300 per share to acquire Class B shares if they really are worth far less (if anything). Shah claims that he is acting out of the goodness of his heart in an effort to share his wealth with the investors who have supported him. *See* Second TRO Tr. 98. Perhaps so.

It is also possible that Shah is playing a longer game. The Company has been a developmental stage, pre-revenue entity for twelve years. During those twelve years, the Secondary Issuers have sold Class B shares based on the Company's disclosures about the oodles of revenue it would generate from related-party transactions. That story can only be sustained for so long.

If Shah can complete the Tender Offer, even partially, he can point to an actual transaction. Using the headline (albeit fictitious) price of $4,720 per share, Shah can claim that the Tender Offer validates the value of the Class B shares at that price. Even at the real price reflected in the difference between the Strike Price and the Trigger Price, Shah can claim that the Class B shares are worth up to $300 per share, and he can represent that previous investors in the Class B shares received returns of up to 300%. Claims like that will make it easier to convince future investors to buy Class B shares.

In a classic Ponzi scheme, the operator of the scheme raises money based on promises of outsized gains. He then uses some of the money he brings in to provide above-

53

market returns to early investors. By doing so, he creates a track record that he can tout to future investors to sustain the scheme—at least for a time. One need not squint too hard to see a familial resemblance between the Tender Offer and an early step in a classic Ponzi scheme, with Shah and the Secondary Issuers using some of the money they have raised to pay Class B investors so they can tout those returns.

The significance of the decision that the Class B stockholders face and the diametrically opposing possibilities make it all the more important that they have full and fair information about the Tender Offer so that they can make an informed choice. If the Tender Offer is bona fide, then Shah and the Secondary Issuers should be able to provide the information that Delaware law requires. The balance of the equities therefore weights in favor of the issuance of a TRO.

## D. The Form Of The TRO

When crafting a remedy, a court must tailor the relief "to meet the needs of the situation" and be "as fair as possible to all of the competing interests." *Eisenberg*, 537 A.2d at 1062–63. The logical remedy here is a TRO that restrains the defendants from taking any action to proceed with or facilitate the Tender Offer unless and until the defendants can show that they have made full and fair disclosure of all material information, in writing, through information filed with the SEC and clearly and directly renounced any threats of litigation against non-tendering stockholders.

Ordinarily, the court would rely on the parties to issue disclosures in an appropriate form to satisfy a disclosure-based TRO. The defendants, however, are self-represented, and the lone securities lawyer who appears in the record has been disbarred in New York and

suspended from practicing before the SEC. Rather than providing the Class B stockholders with a written disclosure document, the defendants have shared information in emails and conference calls. The Company filed the Facilitation Letter and Instructions to Stockholders so that the Class B stockholders could tender into the Tender Offer. Those documents provide minimal information about the Tender Offer.

The Company is registered with the SEC and makes filings on EDGAR. Under the unique circumstances of this case, it makes sense to require that the defendants make any attempt to address the TRO by using the disclosure documents contemplated by the SEC. Consequently, before the defendants can apply to lift the TRO, the defendants must satisfy three conditions.

First, Shah and the Secondary Issuers must file a Schedule TO along with an Offer to Purchase that complies with the disclosure requirements set forth in Regulation M-A. *See* 17 C.F.R. § 229.1000–.16. The Offer to Purchase must set out the terms of the Tender Offer and all material information associated with it, including but not limited to:

- a description of the parties making the Tender Offer;

- the number of shares that Shah and the Secondary Issuers seek to purchase;

- the price offered in the Tender Offer;

- any conditions attached to the Tender Offer;

- a summary of the process and events leading up to the Tender Offer;

- the plans that Shah has for the Company;

- the identities of the persons who are soliciting shares for Shah and the Secondary Issuers; and

55

- the amount and source of the funds that Shah and the Secondary Issuers will use to complete the Tender Offer.

The Offer to Purchase also must provide any specific information that Shah is required to disclose under Delaware law as a controller making a tender offer, including the information discussed previously in this decision.[37]

Second, after Shah and the Secondary Issuers provide their disclosures, the Company must submit a responsive filing on Schedule 14D-9 that complies with all of the requirements of Rule 14d-9. *See* 17 C.F.R. § 240.14d-9. Among other things, the responsive filing must disclose the Board's position on the Tender Offer, the identity of the members of the Board making the recommendation, a description of the securities that are being sought in the Tender Offer, and any arrangements with Shah and the Secondary Issuers. The Schedule 14D-9 also must include any additional information that the directors and officers of the Company are required to disclose under Delaware law as fiduciaries responding to the Tender Offer, including the information discussed previously in this decision.

---

[37] The TRO will not lift if Shah and the Secondary Issuers continue to make inaccurate statements in the Schedule TO and Offer to Purchase, such as the claim that investment bankers are acquiring the Class B shares or the assertion that the Tender Offer price is $4,720 per share. Plainly, the Secondary Issuers are seeking to acquire the Class B shares, and plainly they are not offering to pay $4,720 per share. Rather, Shah and the Secondary Issuers are offering to acquire the Class B shares and cancel each tendering stockholder's subscription agreement in return for an amount equal to the difference between the Trigger Price and the Strike Price in each tendering stockholder's subscription agreement, paid out over time.

56

Third, Shah, the Secondary Issuers, and the Company must jointly file a Schedule 13E-3 that complies with all of the requirements of Rule 13e-3. *See* 17 C.F.R. § 240.13e-3. Among other things, the Schedule 13E-3 must state the purpose of the Tender Offer, explain the fairness of the Tender Offer to the unaffiliated stockholders, and describe and file any reports, opinions, appraisals, and negotiations provided and entered into in connection with the Tender Offer.

If the defendants have satisfied these conditions, then the defendants may file a single, joint motion to lift the TRO. The joint motion will explain whether the foregoing documents have been filed and how the documents address the Delaware law issues identified in this decision. The joint motion will attach copies of the documents as exhibits. The Company and Penndel must be represented by Delaware counsel, who must file the joint motion on their behalf. Although it is inadvisable for the individual defendants to continue to represent themselves, they may do so. The entities may not.

After the defendants have filed their motion, Lentz will have an opportunity to oppose the motion by explaining why the defendants have either failed to disclose all material information as required by Delaware law or failed to render the Tender Offer non-coercive. If Lentz has new challenges to make to the defendants' disclosures, then he will file an amended complaint setting out those challenges.

Assuming that Lentz has opposed the lifting of the TRO, then the defendants may file a single, joint reply. The court will determine if a hearing is warranted.

Unless the motion to lift the TRO is granted, it will remain in effect until modified by court order for good cause shown, the issuance of a preliminary injunction that supersedes the TRO, or the final disposition of this action on the merits.

### III.   CONCLUSION

For all these reasons, the TRO is renewed and modified as set forth in this decision. The court will enter an order documenting the renewed and modified TRO. The existing TRO entered on July 7, 2022, will remain in effect until the court enters the order.